BREYER, Circuit Judge.
 

 The Ford Motor Company appeals a federal district court decision, 30 B.R. 458, allowing a bankrupt Ford dealer (Pioneer Ford Sales, Inc.) to assign its Ford franchise over Ford’s objection to a Toyota dealer (Toyota Village, Inc.). The district court decided the case on the basis of a record developed in the bankruptcy court. The bankruptcy court, 26 B.R. 116, had approved the transfer, which ran from Pioneer to Fleet National Bank (Pioneer’s principal secured creditor) and then to Toyota Village. Fleet sought authorization for the assignment because Toyota Village will pay $10,000 for the franchise and buy all parts and accessories in Pioneer’s inventory at fair market value (about $75,000); if the franchise is not assigned, Ford will buy only some of the parts for between $45,000 and $55,000. Thus, the assignment will increase the value of the estate. Fleet is the appellee here.
 

 The issue that the case raises is the proper application of 11 U.S.C. § 365(c)(1)(A), an exception to a more general provision, 11 U.S.C. § 365(f)(1), that allows a trustee in bankruptcy (or a debtor in possession) to assign many of the debt- or’s executory contracts even if the contract itself says that it forbids assignment. The exception at issue reads as follows:
 

 (c) The trustee [or debtor in possession] may not assume or assign an executory contract ... of the debtor, whether or not such contract ... prohibits assignment if—
 

 (1)(A) applicable law excuses [the other party to the contract] from accepting performance from ... an assignee ... whether or not [the] ... contract ... prohibits ... assignment.
 

 The words “applicable law” in this section mean “applicable non-bankruptcy law.”
 
 See
 
 H.R.Rep. No. 95-595, 95th Cong., 1st Sess. 348 (1977),
 
 reprinted in
 
 [1978] U.S.Code Cong. & Ad.News 5787, 5963, 6304; S.Rep. Ño. 95-989, 95th Cong., 2d Sess. 59 (1978),
 
 reprinted in
 
 [1978] U.S. Code Cong. & Ad.News 5787, 5845. Evidently, the theory of this section is to prevent the trustee from assigning (over objection) contracts of the sort that contract law ordinarily makes nonassignable,
 
 i.e.
 
 contracts that cannot be assigned when the contract itself is silent about assignment. At the same time, by using the words in (1)(A) ‘whether
 
 or not
 
 the contract prohibits assignment,’ the section prevents parties from using contractual language to prevent the trustee from assigning contracts that (when the contract is silent) contract law typically makes assignable.
 
 Id.
 
 Thus, we must look to see whether relevant nonbankruptcy law would allow Ford to veto the assignment of its basic franchise contract “whether or not” that basic franchise contract itself specifically “prohibits assignment.”
 

 The nonbankruptcy law to which both sides point us is contained in Rhode Island’s “Regulation of Business Practices Among Motor Vehicle Manufacturers, Distributors and Dealers” Act, R.I.Gen.Laws § 31 — 5.1—4(C)(7). It states that
 

 [N]o dealer ... shall have the right to ... assign the franchise ... without the consent of the manufacturer, except that such consent shall not be unreasonably withheld.
 

 The statute by its terms, allows a manufacturer to veto an assignment where the veto is reasonable but not otherwise. The statute’s language also indicates that it applies “whether or not” the franchise contract itself restricts assignment. Thus, the basic question that the case presents is whether Ford’s veto was reasonable in terms of the Rhode Island law.
 

 Neither the district court nor the bankruptcy court specifically addressed this question. Their failure apparently arose out of their belief that 11 U.S.C.
 
 *29
 
 § 365(c)(1)(A) refers only to traditional personal service contracts. But in our view they were mistaken. The language of the section does not limit its effect to personal service contracts. It refers
 
 generally
 
 to contracts that are not assignable under nonbankruptcy law. State laws typically make contracts for personal services nonassignable (where the contract itself is silent); but they make other sorts of contracts nonassignable as well.
 
 See, e.g.,
 
 N.Y.State Finance Law § 138 (1974) (making certain government contracts unassignable); N.Y.General Municipal Law § 109 (1977) (same); N.C.Gen.Stat. § 147-62 (1978) (same). The legislative history of § 365(c) says nothing about “personal services.” To the contrary, it speaks of letters of credit, personal loans, and leases— instances in which assigning a contract may place the other party at a significant disadvantage. The history thereby suggests that (c)(1)(A) has a broader reach.
 

 The source of the “personal services” limitation apparently is a bankruptcy court case,
 
 In re Taylor Manufacturing, Inc.,
 
 6 B.R. 370 (Bkrtcy.N.D.Ga.1980), which other bankruptcy courts have followed. The
 
 Taylor
 
 court wrote that (c)(1)(A) should be interpreted narrowly, in part because it believed that (c)(1)(A) conflicted with another section, (f)(1), which states in relevant part:
 

 Except as provided in subsection (c) ..., notwithstanding a provision ... in applicable law that prohibits ... the assignment of [an executory] contract ... the trustee may assign [it]....
 

 As a matter of logic, however, we see no conflict, for (c)(1)(A) refers to state laws that prohibit assignment “whether or not” the contract is silent, while (f)(1) contains no such limitation. Apparently (f)(1) includes state laws that prohibit assignment only when the contract is
 
 not
 
 silent about assignment; that is to say, state laws that enforce contract provisions prohibiting assignment.
 
 See
 
 1 Norton,
 
 Bankruptcy Law and Practice
 
 § 23.14. These state laws are to be ignored. The section specifically excepts (c)(l)(A)’s state laws that forbid assignment even when the contract
 
 is
 
 silent; they are to.be heeded. Regardless, we fail to see why a “conflict” suggests that (c)(1)(A) is limited to “personal services.”
 

 The
 
 Taylor
 
 court cites 2
 
 Collier on Bankruptcy
 
 § 365.05 and the Commission Report, H.R.Doc. No. 93-137, 93rd Cong., 1st Sess. 199 (1973), in support. Both of these sources speak of personal services. However, they do not say that (c)(1)(A), was intended to be
 
 limited
 
 to personal services. Indeed, since it often is difficult to decide whether or not a particular duty can be characterized by the label “personal service,” it makes sense to avoid this question and simply look to see whether state law would, or would not, make the duty assignable where the contract is silent. Thus, the Fifth Circuit has found no reason for limiting the scope of (c)(1)(A) to personal service contracts.
 
 In re Braniff Airways, Inc.,
 
 700 F.2d 935, 943 (5th Cir.1983). Fleet concedes in its brief that “the exception to assignment [of § 365(c)(1)(A) ] is not limited to personal services contracts.” We therefore reject the district court’s conclusion in this respect.
 

 Although the district court did not explicitly decide whether Ford’s veto was reasonable, it decided a closely related question. Under other provisions of § 365 a bankruptcy court cannot authorize assignment of an executory contract if 1) the debtor is in default, unless 2) there is “adequate assurance of future performance.” § 365(b)(1)(C). Pioneer is in default, but the bankruptcy and district courts found “adequate assurance.” For the sake of argument, we shall assume that, this finding is equivalent to a finding that Ford’s veto of the assignment was unreasonable. And, we shall apply a “clearly erroneous” standard in reviewing the factual element in this lower court finding. Fed.R.Civ.P. 52. On these assumptions, favorable to Fleet, we nonetheless must reverse the district court, for, in our view, any finding of unreasonableness, based on this record, is clearly erroneous.
 

 Our review of the record reveals the following critical facts. First, in accord-
 
 *30
 
 anee with its ordinary business practice and dealer guidelines incorporated into the franchise agreement, Ford would have required Toyota Village, as a dealer, to have a working capital of at least $172,000, of which no more than half could be debt. Toyota Village, however, had a working capital at the end of 1981 of $37,610; and its net worth was $31,747. Although the attorney for Fleet at one point in the bankruptcy proceedings said Toyota Village could borrow some of the necessary capital from a bank, he made no later reference to the point, nor did he ever specifically state how much Toyota Village could borrow. Since the tax returns of Toyota Village’s owner showed gross income of $27,500 for 1981, there is no reason to believe that the owner could readily find the necessary equity capital.
 

 Second, at a time when Japanese cars have sold well throughout the United States, Toyota Village has consistently lost money. The financial statements in the record show the following operating losses:
 

 CA (84) 1352
 

 At the same time, the record contains no significant evidence tending to refute the natural inference arising from these facts. The bankruptcy court mentioned five factors that it said showed that Toyota Village gave “adequate assurance” that it could do the job.
 

 1) Toyota Village was an established dealership.
 

 2) Toyota Village was “located within 500 yards of the present Ford dealiership.”
 

 3) Toyota Village had a proven track record for selling ears.
 

 4) Toyota Village was willing and able to pay $15,000 that Pioneer still owed Ford. 4) The owner and sole stockholder of Toyota Village testified that he was willing and able to fulfill the franchise agreement.
 

 The first of these factors (dealer experience), while favoring Toyota Village, is weak, given the record of continuous dealership losses. The second (location) proves little, considering that Pioneer went bankrupt at the very spot. The third (track record) cuts against Toyota Village, not in its favor, for its track record is one of financial loss. The fourth (willingness to pay a $15,000 debt that Pioneer owed Ford) is relevant, but it shows, at most, that Toyota Village
 
 believed
 
 it could make a success of the franchise. The fifth (ability to act as franchisee) is supported by no more than a simple statement by the owner of Toyota Village that he could do the job.
 

 We do not see how the few positive features about Toyota Village that the record reveals can overcome the problem of a history of losses and failure to meet Ford’s capital requirements. In these circumstances, Ford would seem perfectly reasonable in withholding its consent to the transfer. Thus, Rhode Island law would make the franchise unassignable.
 

 The Rhode Island authority we have found supports this conclusion. In
 
 Dunne Leases Cars & Trucks v. Kenworth Truck Co.,
 
 466 A.2d 1153 (R.I.1983) the Supreme Court of Rhode , Island held that failure to meet a condition in the franchise agreement requiring a leasing business to be removed from the dealership site, provided due cause for the manufacturer’s decision to
 
 terminate
 
 the dealership agreement. In
 
 Scuncio Motors, Inc. v. Subaru of New England, Inc.,
 
 555 F.Supp. 1121 (D.R.I.1982), aff
 
 'd,
 
 715 F.2d 10 (1st Cir.1983), the federal district court for the District of Rhode Island wrote that failure to meet a franchise requirement to provide additional selling space provided cause to terminate a dealer contract. Inability to meet capital requirements, as revealed here, would seem to provide reasonable grounds for objecting to a franchise transfer
 
 a fortiori.
 
 If not, a manufacturer would have to allow the transfer of its franchise to virtually any auto dealer.
 

 One might still argue that under Rhode Island law the only “reasonable” course of action for Ford is to allow the transfer and then simply terminate Toyota Village if it fails to perform adequately. This sugges
 
 *31
 
 tion, however, overlooks the legal difficulties that Ford would have in proving cause for termination under the Rhode Island “Regulation of Business Practices Among Motor Vehicle Manufacturers, Distributors and Dealers” Act. R.I.Gen.Laws § 31 — 5.1— 4(D)(2). The very purpose of the statute— protecting dealer reliance — suggests that it ought to be more difficult for a manufacturer to terminate a dealer who has invested in a franchise than to oppose the grant of a franchise to one who has not. In any event, the law does not suggest a manufacturer is “unreasonable” in objecting to a transfer unless he would have “good cause” to terminate the transferee. And, to equate the two standards would tend to make the “unreasonable” provision superfluous. Thus, we conclude that the Rhode Island law would make the franchise unas-signable on the facts here revealed. Therefore, neither the bankruptcy court nor the district court had the power to authorize the transfer.
 

 We shall briefly consider three additional points. First, Ford notes that the franchise contract says that Michigan law governs. We thus cannot be certain that Rhode Island provides the relevant nonban-kruptcy law without deciding whether its “dealer protection” policies are sufficiently strong to overcome the contract’s “choice of law” provision as applied in a diversity case brought in a Rhode Island federal court.
 
 See Restatement (Second) of Conflict of Laws
 
 § 187 (1971);
 
 D’Antuono v. CCH Computax Systems, Inc.,
 
 570 F.Supp. 708, 812-13 (D.R.I.1983). We avoid this “conflicts” question, however. For one thing, we have no reason to believe that Michigan law differs in any relevant respect.
 
 See
 
 Mich.Stat.Ann. § 19.-856(34)(l)(i) [M.C.L.A. § 445.1574(l)(i) ]. For another, Fleet, standing in Pioneer’s shoes, asks us to decide the matter as one of Rhode Island law. It has not briefed Michigan law. Thus, we take Fleet to have waived the point.
 

 Second, the district court and bankruptcy court noted that Ford did not object when the two people who run Pioneer, Messrs. Perron and Rosenthal, assigned the franchise to Mr. Arthur Manchester, the former retired owner of Pioneer Ford. Ford explains that it did not formally object to this assignment — which took place the day before bankruptcy was declared — because it believed Manchester intended to resign the dealership, not assign it via Fleet to Toyota. Regardless, no one suggests that Ford failed to object to the Fleet or Toyota assignments. Nor does anyone argue that a manufacturer who consents to one assignment must thereafter consent to all assignments. Moreover, Arthur Manchester had previously run the Pioneer franchise successfully. We do not see how Ford’s consent to Perron and Rosenthal's transfer to their former employer, Manchester, could show that a failure to consent to a subsequent transfer to Toyota Village was unreasonable.
 

 Third, Ford argues that the bankruptcy court lacked jurisdiction over the proceeding for the reasons set forth in
 
 Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,
 
 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). It adds that the district court lacked jurisdiction to enter its order authorizing the assignment of the franchise because the court rules allowing district courts to decide bankruptcy matters are unlawful. We need not consider these questions. Technically speaking, if Ford is correct on these contentions, the proper action for this court is to order that the district court’s judgment be vacated. We take that same action because we accept Ford’s arguments on the merits. We shall consider these “bankruptcy jurisdiction” matters in other cases, the facts of which bring the legal issues more clearly into focus. And, even though they are labelled “jurisdictional,” we need not decide them now.
 
 Secretary of the Navy v. Avrech,
 
 418 U.S. 676, 677-78, 94 S.Ct. 3039, 3039-40, 41 L.Ed.2d 1033 (1974) (court can avoid answering a “difficult jurisdictional issue” when decision on the merits renders it moot.).
 

 For these reasons, the judgment of the district court is
 

 Reversed.