**In re Thomas Allan LILE, Debtor.**

**Bankruptcy No. 86–05363–H5–11.**

United States Bankruptcy Court, S.D. Texas, Houston Division.

July 26, 1989.

See also, Bkrtcy., 96 B.R. 81.

O. Otis Bakke, Houston, Tex., for debtor.

Louise P. Hytken, Atty., Tax Div., Dept. of Justice, Dallas, Tex.

ORDER AND MEMORANDUM OPINION REGARDING DEBTOR'S MOTION FOR VIOLATION OF THE AUTO-MATIC STAY AND FOR SANC-TIONS UNDER 11 U.S.C. § 362(h)

MARGARET A. MAHONEY,
Bankruptcy Judge.

This matter is before me upon the motion of the debtor, Thomas A. Lile, seeking damages and sanctions for alleged violations of the automatic stay of 11 U.S.C. § 362 by the Internal Revenue Service ("IRS"). I have jurisdiction to hear this matter under 28 U.S.C. § 1334 and § 157 and the Order of Reference of the District Court. Since the disputed issue involves the interpretation and application of a specific provision of Title 11, the proceeding is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(1).[1] The following opinion shall constitute my findings of fact and conclusions of law in accordance with Bankruptcy Rules 7052 and 9014.

## I. FACTUAL AND PROCEDURAL BACKGROUND

1. Bayou City Oyster Company, Inc. (BCOC) was the operator of a restaurant at 2171 Richmond in Harris County, Texas, from 1983 until January 27, 1988.

2. BCOC filed a Chapter 11 bankruptcy case on June 20, 1986.

3. Thomas Lile (Lile) was the sole shareholder and president of BCOC.

4. Thomas Lile also filed a Chapter 11 bankruptcy case on June 20, 1986.

5. BCOC failed to pay its federal employee payroll taxes for all four quarters of 1987. The amount owed was between $155,000—$156,000.

6. In early December, 1987, the IRS contacted the accountant for BCOC regarding the payroll taxes.

7. On December 7, 1987, the Chapter 11 bankruptcy case of BCOC was dismissed.

8. On December 16, 1987, Lile paid a personal visit to the IRS and met with Revenue Officer Tom McGirr about the unpaid payroll taxes. Lile partially completed a collection Information Statement (Form 433B) for BCOC. Lile advised Revenue Agent Tom McGirr that BCOC and Thomas Lile were Chapter 11 debtors. Lile did not know that BCOC's case had been dismissed.

9. Even after Lile's meeting with Revenue Officer McGirr, BCOC failed to make its required federal tax deposits for its employment taxes.

10. On December 17, 1987, assessments were made for the unpaid quarterly employment taxes for the second and third quarters of 1987, and on or about January 4, 1987, a final Notice and Demand for payment was sent to BCOC by certified mail. This notice was returned as refused on January 13, 1988.

11. On January 21, 1988, the IRS learned that BCOC had been dismissed from its Chapter 11 proceeding.

12. On January 22, 1988, the IRS obtained an order for entry on the premises to effect a levy.

13. In preparation for the seizure of corporate property located at the premises of 2171 Richmond Avenue, Houston, Texas, the IRS obtained from the Texas Secretary of State several financing statements (UCC–1s) which indicated security interests of various parties in property belonging to BCOC. One of these UCC–1s indicated a security interest in the name of Gardner Restaurant Supply Company which covered all types of equipment and soft goods presently located or hereafter located or installed upon the premises known as BCOC.

14. On January 27, 1988, McGirr assisted by Revenue Officers Bart Hill and Laura Williamson went to the premises of BCOC for the purposes of seizing property belonging to BCOC in order to satisfy its outstanding tax liabilities.

15. On January 27, 1988, the first day of the seizure, the IRS conducted a sale of perishable food items owned by BCOC. Lile did not dispute that BCOC owned these items or that it owned the computer, or the cash on the premises.

16. At the seizure on January 27, 1988, Lile reiterated to McGirr that Lile personally was the owner of the lease and most of the personal property in the lease premises. Lile reminded McGirr that Lile was a Chapter 11 debtor.

17. Lile was current in his lease payments to Lamesa Properties, his landlord, for the premises at 2171 Richmond, on January 27, 1988.

18. Lamesa filed a relief from stay motion on April 13, 1988, and obtained relief from stay on May 16, 1988.

19. Joseph Caudill, the lease manager for Lamesa Properties, appeared at the seizure. Either he or Lile showed a copy of

---

**1.** See *Wood v. Wood* (*In the Matter of Wood*), 825 F.2d 90 (5th Cir.1987), for a discussion of core proceedings arising only in the context of bankruptcy.

Lile's lease to the IRS, which showed Lile was the owner of the lease.

20. McGirr told Caudill that it did not matter who owned the lease, the IRS was shutting the business down.

21. Lile or his attorneys also told McGirr that Lile or his wife owned most of the furniture and fixtures in the restaurant and that taking the personal property of Lile would violate the Section 362 stay. Lile had no documents to show his or his wife's ownership of the personal property at the seizure except an unfiled copy of his initial Chapter 11 bankruptcy schedules which did not list the personal property.

22. Lile or his relatives had formed a new corporation, Donzi, Inc., to which he planned to transfer the assets of BCOC. This transfer had not occurred at the time of the seizure.

23. Neither BCOC's bankruptcy schedules nor Lile's, on file on January 27, 1988, listed the restaurant furniture and fixtures as assets.

24. Based upon the financing statements on file with the Texas Secretary of State and the use by BCOC of the restaurant equipment and furnishings, the IRS was of the belief that these items belonged to BCOC.

25. Despite warnings, the IRS seized the leasehold estate by locking and securing it and all the contents of the leased space.

26. The IRS chained and/or padlocked the doors and gates of the leased space. Lile never contacted the IRS for access.

27. Lile's bankruptcy schedules were filed on or about August 28, 1986, more than two months after the original bankruptcy petition had been filed.

28. Lile did not amend his bankruptcy schedules to include restaurant furniture and fixtures until February 29, 1988, more than one year and eight months after his original bankruptcy filing and more than one month after the IRS seizure. The value of the omitted assets included in the amended schedules was listed as $125,000.

29. The IRS made arrangements with Joseph Caudill, the landlord's representative, to store the seized assets without rent within the Lile lease space without the knowledge or consent of Lile. The IRS's position was that when Lile did not pay the rent due February 1, 1988, the IRS could negotiate with the landlord.

30. Initially, the IRS had contemplated moving the seized items out of the premises occupied by BCOC; however, given the questions of ownership, the expenses of moving which would be charged against BCOC and considerations of obtaining the best sale price for the property, the IRS determined that it was appropriate under the circumstances to leave the items on the premises occupied by BCOC.

31. The premises occupied by BCOC are generally described as 2171 Richmond Avenue. These premises included leases for the property at 2153, 2157–61 and 2171 Richmond Avenue and a subsequent lease for the patio area operated by the restaurant at 2181 Richmond Avenue. In addition, Lile had leases with Lamesa Properties for some space behind the restaurant on Portsmouth Street. The leases with Lamesa Properties as the landlord were between Lamesa and Lile; BCOC paid the monthly rental on the property and was a sublessee of the property. No written sublease was offered into evidence. Lile testified that BCOC paid the monthly rental directly to Lamesa Properties.

32. On August 19, 1986, Lile filed a motion to assume the unexpired building lease on the property which was used by BCOC. An agreed order was signed on March 10, 1987. It stated that Lile would cure his lease defaults by payment of the sum of $23,521.85.

33. The IRS never requested relief from the 11 U.S.C. § 362 stay in the Lile bankruptcy case.

34. The IRS wanted Lile to produce bills of sale or other documents establishing ownership claims with respect to the property that had been seized. Lile never produced any bills of sale (other than a transfer document between himself and his wife), cancelled checks or contracts to show his personal ownership of the items seized.

35. On February 2, 1988, BCOC filed for bankruptcy under Chapter 7 of the Bankruptcy Code.

36. On February 5, 1988, the IRS met with Jack Wyrick, an enrolled Agent who had a power of attorney to represent Lile with respect to tax matters. Wyrick brought with him copies of Lile's individual 1985 and 1986 federal income tax returns and a corporate return for BCOC. The returns in question showed depreciation claimed on Lile's personal tax return with respect to restaurant equipment; however, the kitchen equipment and leasehold improvements shown as being depreciated are not identified as to any particular restaurant.[2] The IRS said it did not find these returns to be convincing because of the IRS's understanding that Lile had an interest in other restaurants. The corporate return did not claim ownership of the property nor did it claim depreciation.

37. The furniture and equipment in the restaurant were inadvertently left off Lile's bankruptcy schedules although the information was furnished to Lile's counsel who prepared the schedules.

38. The IRS was furnished a letter on March 2, 1988, containing Lile's lease, tax returns, a bill of sale dated March 25, 1988, to Georgia Lile from Thomas Lile, and a copy of Lile's amended Chapter 11 schedules. Also included were several signed and unsigned affidavits of an attorney and accountants. The transfer to Georgia Lile was not disclosed on Lile's statement of financial affairs filed with his bankruptcy schedules in August 1986. The letter also included copies of Lile's individual income tax returns for 1985 and 1986 and BCOC's income tax return for the fiscal year ended June 30, 1986.

39. Upon the IRS's receipt of this letter on March 2, 1988, it was reviewed by Revenue Officer Simon Rodriguez and by his Group Manager Pat Bisson, both of whom were concerned as to the adequacy of the documents submitted on behalf of Lile. These concerns included the omission of a substantial amount of assets from earlier bankruptcy schedules, the fact that the affidavit of Sue Wittie was not signed, the refiling of bankruptcy by BCOC within a few days after the IRS seizure and the fact that the corporate returns showed $61,000 in depreciable assets which the IRS thought represented the property seized.

40. On March 8, 1988, Rodriquez requested assistance from the Special Procedures Staff of the IRS to determine legal ownership of the seized property. On March 11, 1988, he received word from the Chief of the Special Procedures Staff recommending that the items listed on the amended bankruptcy schedules and the items shown on the bill of sale issued to Georgia Lile be released from the IRS seizure. After receiving this recommendation from the Special Procedures Staff, Revenue Officer Rodriguez surveyed the items that had been seized in an effort to identify the items listed on the amended bankruptcy schedules and the bill of sale between Lile and his wife. The property which had been seized which was not identified on either the amended bankruptcy schedule or on the bill of sale was moved to storage by the IRS. On March 17, 1988, the IRS released to Georgia Lile and Thomas A. Lile the items which had been identified.

41. On March 30, 1988, the debtor filed a motion for contempt for violation of 11 U.S.C. § 362 and for sanctions under 11 U.S.C. § 362(h). This original pleading also named the landlord, Lamesa Properties, as a party to the action; Lamesa Properties was dismissed as a party to the action on June 17, 1988.

42. After the property listed on the bankruptcy schedules and the bill of sale was returned to the Liles on March 17, 1988, the Liles did not furnish any additional documentation with respect to ownership claims as to any of the remaining items which were stored. On December 19, 1988, the stored items were returned by the IRS to the Liles.

43. Tom Lile had expended $750,000 in leasehold improvements on the space in the 2100 block of Richmond.

---

**2.** On the Liles' 1986 income tax return, the Liles claimed all depreciation was attributable to a business of Georgia Lile's. This was not explained.

44. Lile lost the leasehold improvements when LaMesa terminated his lease.

45. Prior to the IRS seizure, Lile had not made any efforts to sublease the premises occupied by the restaurant.

46. Immediately prior to the seizure, Lile owned the restaurant equipment in the leasehold which had a value as part of an operating business of $120,000. When the property was returned on March 17, 1988, it had a value of about $10,000.

47. Lile claimed a loss of $960,288 resulting from his inability to sell his rights under his long term lease as a result of the IRS seizure. His lease had on January 27, 1988, a remaining term of about 7 years. His rental rates were low for the area.

48. The lease between Lile and Lamesa Properties forbade subletting or assignment of the premises without the written consent of the landlord.

49. At trial, the IRS presented financial statements and testimony from the accountant, who had been employed to handle accounting and bookkeeping for BCOC beginning in January, 1987, which demonstrated that BCOC was suffering substantial losses. The financial statements presented by the IRS show that BCOC had a loss of $25,979 for the month ending on September 30, 1987; and for the three month period of July, August and September, 1987, that BCOC had a loss of $65,306. No financial statements were ever presented by Lile to show that BCOC ever operated profitably.

## II. DISCUSSION OF ISSUES AND LAW

The threshold issue to be decided by this court is whether the IRS violated the automatic stay provisions of 11 U.S.C. § 362 upon seizure and retention of personal property of the debtor and if so, was this violation willful. If the IRS willfully violated the automatic stay, I must determine the amount of damages to be assessed against the IRS pursuant to 11 U.S.C. § 362(h).

In an opinion dated June 17, 1988, I already found that the IRS can be subject to damages for this violation of 11 U.S.C. § 362(h). I will not restate my conclusions on this issue. That order is the basis for some of the conclusions in this order, and its findings and conclusions are incorporated in this opinion by reference to it. One amendment to the order of June 17, 1988, needs to be made. In that order, I found that the IRS could be subject to damage claims despite sovereign immunity on the basis of 11 U.S.C. § 106(a) and (c). I disagreed with a case in which certiorari had been granted by the Supreme Court. On June 23, 1989, the Supreme Court, in *Hoffman v. Connecticut Dep't of Income Maintenance*, — U.S. —, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989), *aff'd*, 850 F.2d 50 (2nd Cir.1988), held that Section 106(c) did not provide authorization for monetary damages against the federal government. My opinion is therefore incorrect in part. The IRS cannot be held to have waived sovereign immunity under 11 U.S.C. § 106(c).

The IRS is now liable for damages *only* under Section 106(a). The IRS filed a proof of claim against Lile, individually, as a responsible person, for the tax indebtedness of BCOC pursuant to 26 U.S.C. Section 6672. That claim, as well as Lile's claim against the IRS for improper levy on his personal property, arose out of the same transaction or occurrence i.e., BCOC's failure to pay its corporate taxes. *Datair Systems Corp. v. Starkey (In re Datair Systems Corp.)*, 37 B.R. 690, 695 (Bankr.N. D.Ill.1983); *See also Mohawk Industries, Inc. v. United States (In re Mohawk Industries, Inc.)*, 55 B.R. 284, 289 (Bankr. Mass.1985). The same operative facts serve as the basis of both claims. *See U.S. v. Aronson*, 617 F.2d 119 (5th Cir.1980); *Plant v. Blazer Financial Services*, 598 F.2d 1357 (5th Cir.1979).

The filing of a petition in bankruptcy automatically invokes a stay on the commencement or continuation of almost all actions by an entity against the debtor or property of the debtor's estate. 11 U.S.C. § 362(a) (1988). This provision specifically prohibits "any act to obtain possession of property of the estate or of property from

the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3) (1988). The automatic stay provides a business with a chance to propose a plan of reorganization without interference from its creditors while at the same time preventing creditors from pursuing their own remedies against the debtor to the detriment of others. *United Savings Assoc. of Texas v. Timbers of Inwood Forest Assocs. (In re Timbers of Inwood Forest Assocs.)*, 793 F.2d 1380, 1409 (5th Cir.1986), *aff'd en banc*, 808 F.2d 363 (5th Cir.1987). An examination of the legislative history of 11 U.S.C. § 362 reveals that "the automatic stay is one of the fundamental protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts and permits the debtor to attempt repayment or reorganization...." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 340–42 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 54–5 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5840–41, 6296–98.

■ The automatic stay is effective upon the filing of the bankruptcy petition. *LaTempa v. Long (In re LaTempa)*, 58 B.R. 538, 540 (Bankr.W.D.Va.1986); *Shriver v. Tingley (In re Shriver)*, 46 B.R. 626, 629 (Bankr.N.D. Ohio 1985). It does not require actual notice to be effective. *Carter v. Van Buskirk (In the Matter of Carter)*, 16 B.R. 481, 483 (Bankr.W.D.Mo. 1981), *aff'd*, 691 F.2d 390 (8th Cir.1982). Once notice of the bankruptcy filing is received, a creditor is subject to all of the Code's provisions regarding the automatic stay. *Stucka v. United States (In re Stucka)*, 77 B.R. 777, 781 (Bankr.C.D.Cal.1987). Any notice, whether oral or written, is sufficient. *Id.* However, the automatic stay does not permanently prevent a party from retrieving property possessed by the debtor's estate. *Computer Communications, Inc. v. Codex Corp. (In re Computer Communications, Inc.)*, 824 F.2d 725, 729 (9th Cir.1987). Section 362(d) provides that after notice and a hearing, the court shall grant relief from the stay if certain conditions are satisfied.[3] "All parties benefit from the fair and orderly process contemplated by the automatic stay and judicial relief procedure. Judicial toleration of an alternate procedure of self-help and post hoc justification would defeat the purpose of the automatic stay." *Id.* at 731.

■ Section 362(h) of the Bankruptcy Code was enacted in 1984 to provide the bankruptcy court with the power to impose sanctions for willful violations of the automatic stay pursuant to 11 U.S.C. § 362(a). This subsection states: "An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(h) (1988). The relief provided for a willful violation of the stay under 11 U.S.C. § 362(h) is mandatory.[4] A debtor only needs to prove that he was injured by a "willful" violation of the automatic stay. *Budget Service Co. v. Better Homes of Virginia, Inc.*, 804 F.2d 289, 293 (4th Cir. 1986). The term "willful" has been construed to mean deliberate or intentional. *Mewes v. Bankwest of South Dakota (In re Mewes)*, 58 B.R. 124, 128 (Bankr.D.S.D. 1986); *Tel–A–Communications Consultants, Inc. v. Auto–Use (In re Tel–A–Communications Consultants, Inc.)*, 50 B.R. 250, 254 (Bankr.D.Conn.1985). A violation of the automatic stay by itself does not automatically warrant an award of monetary damages or the imposition of sanctions. *Wagner v. Ivory (In re Wagner)*, 74 B.R. 898, 901 n. 8 (Bankr.E.D.Pa.1987); *In re NWFX, Inc.*, 81 B.R. 500, 503 (Bankr. W.D.Ark.1987). However, when a party acts with knowledge of a pending bankruptcy, a violation of the stay is considered willful. *In re Meinke, Peterson & Damer,*

---

**3.** The automatic stay remains in effect unless relief is granted after request or until such property is no longer property of the estate or the case is closed or dismissed or a discharge is granted. *See* 11 U.S.C. § 362(c).

**4.** This subsection supplements but does not replace the preexisting remedy of civil contempt. *See* 130 Cong.Rec. H1942 (daily ed. March 26, 1984) (remarks of Rep. Rodino). In order to have a cause of action under 11 U.S.C. § 362(h), a finding of contempt is not necessary.

*P.C.*, 44 B.R. 105, 108 (Bankr.N.D.Tex. 1984). Once a party is put on notice of a bankruptcy filing, he is under a duty to seek further information which should reveal the applicability and scope of the automatic stay. *Wagner*, 74 B.R. at 904. "Knowledge of the bankruptcy filing has been held to be the legal equivalent of knowledge of the automatic stay." *Id.* The creditor takes the risk of being assessed for damages if he fails to obtain clarification from the bankruptcy court. *In re Clark*, 49 B.R. 704, 707 (Bankr.D. Guam 1985) (citing *Pody v. Pody (In re Pody)*, 42 B.R. 570, 573–74 (Bankr.N.D.Ala. 1984)).

■ In this case, upon the filing of Lile's Chapter 11 petition, the automatic stay was in effect. Both the unexpired lease and certain furniture and equipment were property of Lile's estate under 11 U.S.C. § 541(a) and were subject to the stay. The attempted seizure by the IRS of the leasehold premises and other personal property constituted an act to obtain possession or to exercise control over property of the estate and therefore was a violation of the automatic stay imposed by 11 U.S.C. § 362(a).

■ There is no doubt that the IRS had previous knowledge of Lile's pending bankruptcy and knew that the lease was in Lile's name and was not property of the taxpayer corporation, Bayou City.[5] Although the furniture and fixtures were not listed on Lile's schedules, they were not listed on Bayou City's schedules either. This should have led the IRS to inquire further. In addition, at the time of the seizure, the conversation between the IRS agent, debtor and debtor's attorney regarding Lile's personal ownership of the property was sufficient to cause a reasonably prudent person to make further inquiry before seizing the property. The agent knowingly chose to disregard the stay by continuing with the seizure rather than seeking further clarification. Consequently, he assumed the risk that his actions would be found wrongful.

■ The IRS is equipped with an experienced legal staff that is familiar with the application and scope of the automatic stay. The agent knew or should have known of the protection to which a debtor is entitled. The agent's actions were deliberate and intentional, and thus constituted willful conduct upon the part of the IRS. Even if the IRS had a valid reason for seizing the property, it violated the bankruptcy laws by failing to obtain relief from the automatic stay pursuant to 11 U.S.C. § 362(d) before seizing the property. In addition, it was 50 days before any property was returned, and some property was held by the IRS for almost 11 months. "A creditor has an affirmative duty to return the property and restore the status quo once it learns its actions violated the stay." *Wariner v. First State Bank of Livingston (In re Wariner)*, 16 B.R. 216, 218 (Bankr.N.D. Tex.1981). The retention of Lile's property with full knowledge of the bankruptcy petition is in itself a continuing violation of the stay and grounds for damages. *Miller v. Savings Bank of Baltimore (In re Miller)*, 10 B.R. 778, 780 (Bankr.Md.1981), *aff'd*, 22 B.R. 479 (D.C.Md.1982).

I therefore hold that the actions taken by the IRS clearly reflect a willful violation of the 11 U.S.C. § 362 automatic stay for which sanctions should be imposed. Where a willful violation of the stay is demonstrated, compensatory damages are mandatory. 11 U.S.C. § 362(h) (1988). As a consequence of the seizure and continued retention of Lile's personal property, Lile was unable to use the premises for any valuable purpose. He could have used them at least until Lamesa obtained an order lifting the stay—a period from January 27, 1988, to May 16, 1988. The IRS deprived Lile of control of the leasehold improvements, kitchen equipment and certain furniture in the leasehold at a time when they were possibly saleable at a higher price in bulk and in place. The IRS returned the equipment and furniture, at various times, through December, 1988.

Referring now to the question of damages pursuant to 11 U.S.C. § 362(h), I will

---

**5.** Lile listed the lease as personal property on his bankruptcy schedules.

consider first whether 11 U.S.C. § 365(c)(1)(A) operates to preclude assignment of the debtor's unexpired lease. A prohibition of assignment significantly reduces the amount of damages which may be assessed against the IRS for its willful violation of the automatic stay under 11 U.S.C. § 362 for seizing Lile's leasehold.

Section 365 of the Bankruptcy Code grants a debtor in possession, subject to the court's approval, the broad power to assume or reject the debtor's executory contracts or unexpired leases. 11 U.S.C. § 365(a) (1988). The policy behind this provision is to assist the debtor's rehabilitation by allowing the debtor in possession to take advantage of a contract or lease·that will benefit the debtor's estate while at the same time having the option to reject a contract or lease which may be onerous. However, the power to assume and assign an executory contract or unexpired lease is not unlimited. Section 365(c)(1)(A) is an exception to the more general provision, found in Section § 365(f), which states:

> Except as provided in subsection (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts or conditions the assignment of such contract or lease, the trustee may assign such contract or lease....

11 U.S.C. § 365(f)(1) (1988).

The exception at issue provides:

> (c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
>
> (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease·from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession whether or not

such contract, or lease, prohibits or restricts assignment of rights or delegation of duties....

11 U.S.C. § 365(c)(1)(A) (1988).

The legislative history of 11 U.S.C. § 365(c) indicates that this prohibition against assumption or assignment applies only when "applicable nonbankruptcy law excuses the other party from performance ... independent of any restrictive language in the contract or lease itself." *See* H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 348 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 59 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5845, 6304. The legislative history further reveals that contracts requiring the performance of nondelegable duties should not be assumable against the interest of the nondebtor party. *See* Commission Report, H.R.Doc. No. 93–137, 93d Cong., 1st Sess. 199 (1973). Although 11 U.S.C. § 365(c)(1)(A) would include personal service contracts, nothing in its legislative history indicates that it was intended to be limited solely to personal service contracts.

A majority of courts, which have considered 11 U.S.C. § 365(c) when confronted with an issue of nonassignability, have found 11 U.S.C. § 365(c)(1)(A) to apply only to "contracts based upon personal services or skills, or upon personal trust or confidence." 2 *Collier on Bankruptcy* paragraph 365.05 at 365–42 (15th ed. 1989); *In re Taylor Mfg., Inc.,* 6 B.R. 370, 372 (Bankr.N.D.Ga.1980).[6] In *Taylor,* the lease of real property was not found to be such a nondelegable personal service contract. "An appropriate assignee can perform as well as the debtor and therefore, no injury would be incurred by the lessor." *Taylor,* 6 B.R. at 372. Thus, the lease of real property was held to fall within the general rule of assignability under 11 U.S.C. § 365(f) rather than under the narrow ex-

---

**6.** For other courts that have followed the *Taylor* ruling *See e.g., Abney v. Fulton County, Georgia (In the Matter of Fulton Air Service, Inc.),* 34 B.R. 568 (Bankr.N.D.Ga.1983); *In the Matter of Haffner's 5 Cent to 1.00 Stores, Inc.,* 26 B.R. 948 (Bankr.N.D.Ind.1983); *In re Bronx–Westchester*

*Mack Corp.,* 20 B.R. 139 (Bankr.S.D.N.Y.1982); *In re Boogaart of Florida, Inc.,* 17 B.R. 480 (Bankr.S.D.Fla.1981); *Varisco v. Oroweat Food Co. (In re Varisco),* 16 B.R. 634 (Bankr.M.D.Fla. 1981).

ception provided in 11 U.S.C. § 365(c)(1)(A). *Id.*

Lile's lease of the restaurant premises is not a contract for personal services. If the majority opinion is followed, Lile would not be precluded from assigning his lease under 11 U.S.C. § 365(c). Therefore, he would be entitled to damages for the lost value of his unexpired lease.

However, the more recent case law interpreting 11 U.S.C. § 365(c)(1)(A) has not limited its effect merely to personal service contracts. Instead, a court is required to look at *all* relevant nonbankruptcy law to determine if the law would negate the assignment of the contract or unexpired lease. *In re Pioneer Ford Sales, Inc.,* 729 F.2d 27 (1st Cir.1984) (emphasis added). In *Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.),* 700 F.2d 935, 943 (5th Cir.1983), *reh'g. denied,* 705 F.2d 450 (5th Cir.1983), the Fifth Circuit rejected the majority's narrow interpretation of § 365(c) stating that:

> Nothing in the statute authorized the district court to depart from the express language of § 365(c), which provides for its application to unexpired leases and belies any limitation to personal service contracts.... Surely, if Congress had intended to limit § 365(c) specifically to personal service contracts, its members should have conceived of a more precise term than "applicable law" to convey that meaning.

The Fifth Circuit held that under applicable FAA regulations, the United States, as lessor, was excused from accepting the performance of the assignee, PSA. Thus, under *Braniff,* any executory contract or unexpired lease is unassignable if applicable nonbankruptcy law excuses acceptance of performance.

Several other decisions have held that the reference to applicable law in § 365(c) includes situations in which state or federal law can be said to bar assignment and is therefore not limited to personal service contracts. *See, In the Matter of West Electronics Inc.,* 852 F.2d 79 (3rd Cir.1988) (federal law prohibited debtor's assignment of contract without government's consent.); *In re Pioneer Ford Sales, Inc.,* 729 F.2d 27 (1st Cir.1984) (automobile dealer franchise held nonassignable where Rhode Island law gave manufacturer the power to veto assignments); *Pennsylvania Peer Review Org. v. United States (In re Pennsylvania Peer Review Org., Inc.),* 50 B.R. 640 (Bankr.M.D.Pa.1985) (assignment of a government contract barred by 41 U.S.C. § 15); *In re Nitec Paper Corp.,* 43 B.R. 492 (S.D.N.Y.1984) (federally subsidized electric power contract is nonassignable by statutory command).

The decision in *Braniff* has not gone uncriticized. The court in *Fulton* stated that *Braniff'*s interpretation of 11 U.S.C. § 365(c) rendered portions of 11 U.S.C. § 365(f) meaningless. *Abney v. Fulton County Georgia (In the Matter of Fulton Air Services, Inc.),* 34 B.R. 568, 572 (Bankr.N.D.Ga.1983). The *Fulton* case reasoned that the statute's use of the words "prohibits" and "excuses" shows an intent by the drafters that subsection (c) apply to a different group of contracts and leases than subsection (f). *Id.* Based on this interpretation, the court went on to adopt the majority view and limited the application of § 365(c) to nondelegable personal service contracts. By contrast, the *Nitec* and *Pioneer Ford* cases conclude that 11 U.S.C. § 365(f) allows a trustee to assign a contract even though the contract bars such assignment and even if applicable state law would enforce contractual provisions prohibiting assignment. *Pioneer Ford,* 729 F.2d at 29; *Nitec,* 43 B.R. at 498. These cases state that 11 U.S.C. § 365(c) refers to specific federal or state laws forbidding assignment whether or not the contract is silent about assignment. *Id.* A federal or state statute may not be circumvented under subsection (f). *Nitec,* 43 B.R. at 498.

 Following the Fifth Circuit precedent and in light of the plain meaning of the words of 11 U.S.C. § 365(c)(1)(A), I must find the Lile lease to be nonassignable. *Cf. United States v. Ron Pair Enterprises, Inc.,* ——— U.S. ———, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (holding plain

meaning of language of 11 U.S.C. § 506(b) controls since there was no evidence the literal application of the statute would contradict the intent of the drafters). The nonbankruptcy law which applies in this case is contained in Texas Property Code Section 91.005 entitled "Subletting Prohibited." It states that:

> During the term of a lease, the tenant may not rent the leasehold to any other person without the prior consent of the landlord.

V.T.C.A., Property Code § 91.005 (1984). This statutory rule prohibiting subletting also forbids assignment. *Dillingham v. Williams*, 165 S.W.2d 524, 526 (Tex.Civ. App.—El Paso 1942, writ ref'd w.o.m.). The statute allows the lessor to veto assignment regardless of whether the lease itself restricts assignment. Although the *Lile* lease also contained a provision prohibiting assignment without consent, the lease provision itself is irrelevant to a determination of assignability under Sections 365(c) and (f). In order to change the statutory prohibition against assignment, the parties must express such an intent in their lease. *Lawther v. Super X Drugs of Texas*, 671 S.W.2d 591 (Tex.Civ.App.—Houston, 1984, no writ.).

In accordance with the Fifth Circuit ruling, Lile would have no legal right to assign the unexpired lease without the express consent of his landlord. No evidence of express consent was presented. Section 365(f) is inapplicable in this case because it excepts from its scope assignments prohibited by 11 U.S.C. § 365(c). Since the lease is unassignable, Lile could not recover any damages for the value of the lease except for the time he could have been in the premises until the landlord, Lamesa Properties, obtained relief from the stay.

I am bound by the Fifth Circuit precedent; however, given the interpretation of 11 U.S.C. § 365(c)(1)(A) stated in the *Braniff* case and related cases, the language of Section 365(c)(1)(A) should be changed by Congress. The broader interpretation of the section reflects an attitude in the law which will many times be inequitable. A debtor must act to preserve, protect and enhance the assets of its bankruptcy estate. *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc.* (*In re Continental Air Lines, Inc.*), 780 F.2d 1223, 1225 (5th Cir.1986). An unexpired lease is often the major asset of a Chapter 11 debtor and of "critical importance" to all of its creditors. *In the Matter of Haffner's 5 Cent to $1.00 Stores*, 26 B.R. 948, 949 (Bankr.N.D.Ind.1983). "To deprive it of the benefits which derive from the assignment of such a lease, would be to deprive it of a realistic chance of successfully reorganizing." *Fulton*, 34 B.R. at 572. Under the *Braniff* holding, any governing authority could promulgate laws prohibiting the assignment of executory contracts or leases and consequently defeat the purposes behind § 365 of the Bankruptcy Code. *Id.*

Not only is a debtor in possession precluded from *assigning* a valuable lease or contract based on the strict and literal interpretation of Section 365(c)(1), but it may also be precluded from *assuming for its own rehabilitation efforts* a contract or lease in which applicable law excuses the nondebtor party "from accepting performance from or rendering performance to an entity other than the debtor or debtor in possession." 11 U.S.C. § 365(c)(1) (1988). For despite the apparent limiting language "other than the debtor or debtor in possession" contained in Section 365(c)(1), at least one court has held that a debtor in possession may not *assume* a contract where nonbankruptcy law precludes *assignment* to a third party. *In the Matter of West Electronics Inc.*, 852 F.2d 79, 83 (3rd Cir. 1988) (Since debtor in possession could not force the government to accept the services of an assignee, debtor could not assume the contract).

Due to the *Braniff* case and the plain language of 11 U.S.C. § 365(c), I must conclude that Lile's damages as to his lease are solely the damages arising from his inability to use the Richmond premises from January 27, 1988, through May 16, 1988. There was no evidence as to this damage. I find that the loss is minimal. Lile could not afford to operate a restaurant in the premises for the 3½ months.

He had no capital to start a new restaurant. BCOC was closed. He had neither assets nor time. The damage therefore was Lile's inability to use the premises to show his furniture, fixtures and equipment to obtain a maximum sales price. These damages are tied directly to the value of the furnishings.

The evidence showed that Lile's personal property was worth $120,000 in place if sold in conjunction with an operating restaurant. The only evidence about its value when returned was that Lile asserted it had a value of $10,000. The furniture could not be sold as part of an operating restaurant since Lile had no lease and no restaurant. The furniture, arranged attractively in the lease space might have yielded a higher price than at auction. However, I have no evidence to support that. Therefore, the damages are $0 as to the decline in value of the furniture. Lile also spent $750,000 on leasehold improvements. The leasehold improvements were lost as a result of the loss of the lease and not as a result of the violation of the stay so the $750,000 is not compensable.

Lile was prevented from possessing and selling his personal property for nearly 2 months as to some property and 11 months as to the rest. If he had possessed it, he could have sold it and gained interest. I find that 9% interest on $10,000 or $450 for six months is appropriate as a damage award for this loss.

Where the debtor is forced to resort to the courts to enforce his rights, attorney's fees should be awarded to the debtor's attorney in order to make the debtor whole. Section 362(h) specifies that attorneys' fees may be awarded. At the trial, I indicated I would require debtor's counsel to submit an affidavit detailing his fees and expenses, if an award was appropriate based on the facts. An award is appropriate. Debtor's counsel shall submit an affidavit detailing his fees and expenses by August 10, 1989. The IRS shall object, if it wishes, by August 25, 1989.

 I also conclude that an award of punitive damages is appropriate in this case. In order to sustain an award for punitive damages, "the defendant must have acted with actual knowledge that he was violating the federally protected right or with reckless disregard of whether he was doing so." *Wagner*, 74 B.R. at 904 (citing *Cochetti v. Desmond*, 572 F.2d 102 (3rd Cir.1978)). Punitive damages are proper as a deterrent to those entities who willfully violate the automatic stay provisions, even if actual damages are minimal. *NWFX*, 81 B.R. at 504. "The amount of punitive damages awarded is a function of the offending party's financial capabilities. The award must be sufficient to sting the pocketbook of the wrongdoer." *Mercer v. D.E.F., Inc.* (*In re Mercer*), 48 B.R. 562, 566 (Bankr.D.Minn.1985). The IRS had full knowledge that Lile had filed a Chapter 11 petition, and yet, it refused to adhere to the requirements of the automatic stay. The IRS agent acted with reckless disregard and in "arrogant defiance" of a federally protected right. The IRS's actions caused unnecessary expense to Lile's estate which could have been avoided if the IRS had first sought relief from the stay under 11 U.S.C. § 362(d). Thus, I find that punitive damages of $100,000 are necessary to deter the IRS from willfully violating 11 U.S.C. § 362(a) in the future.

### III. CONCLUSIONS AND SUMMARY OF HOLDING

I hold that the IRS violated the automatic stay provision in this case under 11 U.S.C. § 362(a)(3) damaging Lile in the amount of $450. I additionally find that this violation was willful and that sanctions pursuant to 11 U.S.C. § 362(h) should be imposed against the IRS in the amount of $100,000. I will determine the damages owed for Lile's attorney's fees and expenses upon Lile's counsel's submission of an affidavit by August 10, 1989, and a response by the IRS by August 25, 1989. An order and judgment consistent with this memorandum opinion will then be entered.