**In the Matter of Penny H. FLYNN, Debtor.**

**Penny H. FLYNN, Plaintiff,**

v.

**INTERNAL REVENUE SERVICE and United States of America, Defendants.**

**Bankruptcy No. 92–40789.
Adv. No. 93–4013.**

United States Bankruptcy Court,
S.D. Georgia,
Savannah Division.

May 13, 1994.

R. Wade Gastin, Savannah, GA, for plaintiff.

Lawrence B. Lee, Asst. U.S. Atty., Savannah, GA, for defendants.

### MEMORANDUM AND ORDER

LAMAR W. DAVIS, Jr., Chief Judge.

A trial of the above-captioned case was conducted on February 2, 1994. After considering the evidence, applicable authorities and the argument of counsel, I make the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

Debtor filed a petition for relief under Chapter 13 of the Bankruptcy Code on April 17, 1992. Debtor properly scheduled the Internal Revenue Service ("IRS" or "Service") as a creditor in her case, and the IRS duly received notice of the pendency of Debtor's case pursuant to notice given by the Clerk of this Court. On August 26, 1992, the IRS filed two proofs of claim in Debtor's case, and both claims were allowed for payment under Debtor's Plan, which was confirmed on November 19, 1992. Copies of the Order of Confirmation were mailed to all creditors scheduled by the Debtor, including the Service.

Debtor and her husband were divorced prior to her bankruptcy, and Debtor had custody of, and provided support to, their two minor sons. A significant portion of the claim of the Internal Revenue Service stems from tax liabilities that arose during the time that Debtor and her husband were married, living together, and filing joint returns. Debtor testified that the liability arose because her ex-husband had under-reported his income, unknown to her, leading to the assessment of additional taxes.

On or about January 14, 1993, Debtor received a letter, dated January 12, 1993, from NationsBank of Georgia, N.A., advising her

that the IRS had served NationsBank with a levy against the checking account which she maintained there. (Exhibit "P–4"). The letter advised her that the levy required the bank to remit the sums in her account, up to the amount of the levy, within twenty-one days from the date of service of the levy, unless the bank received a release of the levy from the Service before the expiration of that time period. The letter further advised her that her account would remain frozen in the meantime.

Debtor was in an extreme state of distress after she received the letter from the bank. She testified that her attorney had assured her that the filing of her Chapter 13 petition would stay any collection activities by any creditor, including the Internal Revenue Service. At the time she filed her case she had been struggling to maintain her obligations, but the large tax obligation from her marriage, for which she was legally liable, but which she apparently had no actual participation in creating, ultimately forced her to file a Chapter 13 petition. Debtor stated that she believed that "the court had let her down and that the IRS was above the law if it could act in such fashion."

NationsBank had enclosed a copy of the notice of levy with the January 12 letter, and the notice provided a toll free telephone number for the Jacksonville office of the Service. On January 15th, Debtor called that number and spoke with one or more persons in the collection unit of the IRS. She first spoke with a Service employee who verified on the Service's computer that the Debtor had filed a Chapter 13 bankruptcy. Debtor told the employee that she needed the Service to release the levy. The representative admitted the levy should not have been filed, and stated that a release of the levy would be processed by the end of the day.

The United States' witness, Ms. Marciano, an IRS employee in the Jacksonville office, stated that she did not speak to the Debtor on January 15th, but that a Ms. Frederick in the Jacksonville office did. Ms. Marciano produced computer records of all the contacts between the Jacksonville office and Debtor or her ex-husband. (Exhibit "P–11"). The records revealed that, on January 15,

the "taxpayer's ex-wife" (i.e., Debtor) had contacted the IRS and stated that she needed the Service to fax a release of the levy to her bank. Entries on this form are made chronologically. Above that line but undated was the following notation: "PREV CMTS TPXW FILED BANKRUPTCY, REQUESTED LP 68 TO L1//." The Service's witness could not identify the source of that information or the date it was entered, but translated the various codes to yield a message of "previous comments, taxpayer's ex-wife filed bankruptcy, requested LP 68 to L1//," the latter symbols being internal codes describing different forms or notices issued by the Service. The fax from the Service was processed on the 15th as promised by the IRS employee, but due to a limited number of fax machines and a large volume of work, it was not actually faxed until the following week. The original notice releasing the levy, however, was mailed from Jacksonville on the 15th and received by NationsBank on Tuesday, January 19, 1993. On that same day, Debtor again contacted the Service and spoke with Ms. Marciano and discussed the situation with her.

The IRS' levy had several unfortunate consequences. First, because the Debtor learned that she could not access her bank account and because she had very limited cash on hand, she was forced to cancel a birthday party that she had planned for her eleven-year-old son on January 16, 1993. This fact added to the distress that she originally experienced upon receipt of the letter from NationsBank informing her of the levy. She spent the entire three day weekend in a state of agitation, what she described as being "in a wreck," worried specifically that her rent and other checks would be dishonored by the bank. She subsequently received notice that several checks issued prior to January 15th, at a time when her account held adequate funds to cover the checks, were dishonored because the checks were presented for payment during the period of time that her account was frozen. See Exhibits P–1, P–2 and P–5. In each case, the bank returned the item to the payee of the check and charged $20.00 directly to the Debtor for the dishonor. Additionally, Debtor was re-

quired, in making good on the dishonored checks, to pay an additional $20.00 insufficient fund charge to each of the payees. All told, Debtor incurred $120.00 in "NSF" charges.

The Service ultimately faxed a copy of the release of levy to NationsBank. Thus, by January 21, 1993, NationsBank had been advised by mail and by fax that the levy had been released. Debtor was forced to endure, however, the final indignity of being stopped in the checkout line of a Kroger supermarket as she was attempting to purchase groceries. Kroger was one of the payees whose check NationsBank refused to honor during the period that Debtor's account was frozen. Thus, although the levy had been removed from Debtor's account, Debtor was still unable to negotiate another check without leaving the checkout line, going to the manager's office and making additional arrangements for payment because Kroger's computer identified her account as being one on which a bad check had previously been drawn. All of this occurred in full view of others in the line and caused her great embarrassment.

Debtor initiated this proceeding on January 26, 1993, alleging that the post-petition levy upon her account constituted a "willful violation" of the automatic stay under Section 362(h) of the Bankruptcy Code. As actual damages, Debtor claims a total of $120.00 in check charges, three days lost wages in the total amount of $360.00, and travel and meal expenses in the total amount of $108.55 due to the fact that she was required to travel to the hearing on this matter from Birmingham, Alabama, where she now resides. She further seeks compensatory damages for mental embarrassment, humiliation and anxiety in the amount of $25,000.00, as well as an award of attorney's fees for her representation in this adversary proceeding. Finally, Debtor seeks an award of punitive damages against the IRS in the sum of $100,000.00.

As part of its defense, the United States sought to show that, notwithstanding the fact that notice was provided to the IRS in accordance with the requirements of the Bankruptcy Rules, that the IRS filed two proofs of claim in the case, and that counsel for the United States appeared on behalf of the IRS

at a hearing on confirmation and to consider the Debtor's objection to the IRS' claim, the notice of levy was issued by the Service's Jacksonville office, which did not have actual knowledge of Debtor's bankruptcy case. In an effort to explain why the Jacksonville office did not have actual notice of Debtor's bankruptcy, Ms. Marciano testified that the bankruptcy unit of the Internal Revenue Service, located in Atlanta, Georgia, receives all notices of bankruptcy filings for this region. Thus, Debtor's bankruptcy filing was properly noted in the records of the bankruptcy unit in Atlanta. However, Debtor and her former husband previously resided in Florida. As a result, the notice of levy was issued by the office located in Jacksonville, Florida, which did not have any information regarding Debtor's bankruptcy. (Exhibit "P–3"). The question, then, is why was the Jacksonville office without notice of Debtor's bankruptcy.

The answer to this question, according to Ms. Marciano, revolves around the fact that the past-due taxes at issue in this proceeding arise from joint returns filed by Debtor and her husband. The collection file for these joint tax obligations contained two Social Security numbers, the first being that of Debtor's ex-husband, and the second being that of Debtor's. According to Ms. Marciano, when dealing with a tax obligation on which a husband and wife are jointly liable, the Service's current collection system is keyed exclusively to the name and Social Security number of the spouse who appears first on the joint return, in this case Debtor's ex-husband. As a result, if the spouse, whose name and Social Security number appear first on the joint return, does not file a bankruptcy, the collection unit of the IRS does not put a "bankruptcy hold" on the collection file for that particular obligation. In other words, when, as in this case, the spouse not appearing first on the joint return, is the only party filing bankruptcy, the Service's current system is incapable of transmitting any information regarding the spouse's bankruptcy to the collection file for the joint tax obligation.

After a taxpayer contacts it, however, the Service is apparently capable of manually

entering the information regarding the taxpayer's bankruptcy into the collection file. Thus, in response to some post-petition collection activity, a taxpayer will often notify the IRS that he or she has filed a bankruptcy case, and at that point, the Service will respond by verifying the information, releasing all levies, and manually entering the information in their records so as to suspend further collection activity. This is accomplished by adding the information concerning the bankruptcy debtor coded to her Social Security number to the Internal Revenue Service collection file under the name of the primary taxpayer. Under the IRS' current system, then, it is virtually certain that the IRS will not transfer the bankruptcy information of a taxpayer, whose name does not appear at the top of a joint return, into the collection file for that joint tax obligation until the IRS has initiated post-petition collection activities against the taxpayer, despite actual notice of debtor's filing.

Ms. Marciano further testified that she did speak with the Debtor by telephone on January 19th, and she informed the Debtor that the release of levy had been mailed on the 15th. Debtor informed her that, as a result of the post-petition levy, she would lose over $300.00 in bank fees and rent penalties. Ms. Marciano explained to the Debtor that she had certain rights in the event of a wrongful levy, and that there was an administrative procedure whereby Debtor could recover the costs incurred as a result of the wrongful levy. Ms. Marciano also took Debtor's new address information, and forwarded copies of the taxpayers' rights brochure to Debtor. However, that letter was returned to the Service on January 26th. Ms. Marciano also attempted on more than one occasion to notify Debtor's counsel Mr. Gastin of her contact with the Debtor and of the fact that the Service would make appropriate restitution for out-of-pocket expenses but received no response.

Many of the internal procedures and nearly all of the capability of the Internal Revenue Service's computers are beyond the understanding of the Court. Certainly no extensive evidence has been introduced on either point. As a result, the Court is faced with the difficult task of gleaning whether the conduct of the Internal Revenue Service is such as that will make it legally responsible to the Debtor for actual or punitive damages while looking through the proverbial "glass darkly." Because the Court cannot speculate on the full scope of the Service's procedures or of its computer capability, it is limited to the specific evidence before it in this case. The uncontradicted evidence is that the collection branch of the Service cannot determine independently, and is not routinely notified when a debtor, who happens *not* to be the primary taxpayer on a joint tax obligation, files bankruptcy. Despite notice to the Service, in accordance with applicable law, the Service does not notify its internal collection unit, and the result is that it continues its collection efforts in accordance with the provisions of federal, non-bankruptcy, law. It is also uncontradicted that an entry was made in the computer records of the collection branch prior to the January 15, 1993, entry, that the "taxpayer's ex-wife" had filed bankruptcy. Interestingly, although the testimony was that collection information is stored and retrieved exclusively under the Social Security number of the Debtor's ex-husband, the collection files of the Internal Revenue Service nevertheless contain the Debtor's Social Security number and other information about her, including the fact that she had a bank account at the NationsBank in Savannah, Georgia.

The Court takes judicial notice of the fact that this is not the first time that a debtor in this Court has filed an adversary proceeding against the Internal Revenue Service seeking damages and/or declaratory relief under similar circumstances.[1] Counsel for the government has acknowledged this fact, forthrightly stating that, because of the inability of the Service's computer program to flag the collection file of a taxpayer when only the so-

---

1. A cursory review of the Court's docket reveals that at least a dozen such cases have been filed in the past two years in this District alone. Approximately 20 additional cases seeking turnover of refunds held in violation of Section 362, but not seeking damages, have likewise been filed since early 1992.

called secondary taxpayer files bankruptcy, Debtor's situation is not an isolated case.

The United States raises a number of defenses to Debtor's claim for damages under Section 362(h). First, it contends that it is immune from an award of damages in this proceeding under the doctrine of sovereign immunity. Second, it contends that the testimony of Ms. Marciano demonstrates that there was no willful violation of the automatic stay because the acts of the IRS were wholly inadvertent. Third, the United States argues that Debtor has not adequately proven any damages, disputing particularly the compensability of Debtor's emotional distress on the grounds that such damages are not supported by medical testimony and that the evidence demonstrates that she had a pre-existing state of emotional distress. The government also points out that it has stood ready since the filing of this case to compensate Debtor for her actual out-of-pocket expenses. Fourth, the government disputes any liability for attorney's fees based upon the fact that, merely by telephonic contact or perhaps some correspondence on the part of counsel, the Service would have compensated the Debtor for her out-of-pocket losses. Finally, the United States argues that the actions of the IRS do not warrant the imposition of punitive damages because there has been no showing that the IRS acted with the sort of malice that is required for such an award under section 362(h).

## CONCLUSIONS OF LAW

This case presents three basic issues. The first is whether the IRS "willfully violated" the automatic stay under section 362(h) of the Bankruptcy Code when it attempted to collect on a pre-petition tax obligation by levying upon Debtor's bank account post-petition. The second issue is whether the United States of America, as the true party

in interest in this case, has waived its sovereign immunity under section 106 of the Code as to any damages which are properly awarded under section 362(h). The final issue is whether Debtor has proven any damages under section 362(h).

## 1. Willful Violation of the Automatic Stay

Section 362(a) of the Bankruptcy Code imposes an "automatic stay" upon the filing of a petition in bankruptcy, which prohibits, among other things, any act to obtain possession of estate property or to collect, assess, or recover a claim against a debtor that arose before the commencement of the debtor's bankruptcy case. 11 U.S.C. §§ 362(a)(3) and (a)(6).[2] "The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws,"[3] and section 362(h) was added to the Bankruptcy Code to provide courts with an enforcement mechanism to protect a debtor from creditors who *willfully violate* the stay. *See In re Solis,* 137 B.R. 121, 124 (Bankr.S.D.N.Y.1992). In this regard, section 326(h) provides:

> An individual injured by any willful violation of a stay provided by [§ 362(a) ] shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(h).

■ The requirement that a stay violation be "willful" does not mean that an entity must act with the specific intention of violating the stay. To the contrary, this court has previously held that "willful", as the term is used in section 362(h), is satisfied when an entity engages in a deliberate act that is done in violation of the automatic stay with knowledge that the debtor has filed a petition

---

**2.** 11 U.S.C. § 362, entitled "Automatic stay", in relevant part provides:
(a) Except as provided in subsection (b) of the section, a petition filed under section 301, 302, or 303 of this title ... operates as a stay, applicable to all entities, of— ...
(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
...

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title.

**3.** H.R.Rep. No. 595, 95th Cong., 1st Sess. 340–342 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News, pp. 5787, 6296–6298.

in bankruptcy. *See McDougald v. Internal Revenue Service (Matter of McDougald)*, Adv. No. 90–4177, slip op. at 12 (Bankr. S.D.Ga. April 24, 1991)[4] "[W]here there is actual notice of the bankruptcy it must be presumed that the violation was deliberate or intentional." *Homer Nat'l Bank v. Namie*, 96 B.R. 652, 654 (W.D.La.1989).

■ The IRS does not dispute that it is subject to the automatic stay imposed under 11 U.S.C. § 362(a). Nor does it dispute that, after receiving notice of Debtor's Chapter 13 bankruptcy, it violated the automatic stay by effecting a post-petition levy upon Debtor's checking account. I therefore conclude that the IRS' actions in sending a notice of levy to Debtor's bank constituted a willful violation of the automatic stay under section 362(h) of the Code.

## 2. Waiver of Sovereign Immunity

■ Debtor has named both the IRS and the United States of America as Defendants in this action. The IRS is a bureau within the Department of the Treasury of the United States of America, and it is not authorized to sue or be sued in its own right.[5] The United States of America, therefore, is the only party properly named as a Defendant in this case. Accordingly, the Internal Revenue Service is dismissed as a Defendant in this action.[6]

■ The doctrine of sovereign immunity bars all lawsuits against the United States of America unless Congress has provided an express and unequivocal waiver of such immunity. *Block v. North Dakota*, 461 U.S. 273, 280, 103 S.Ct. 1811, 1816, 75 L.Ed.2d 840 (1983); *U.S. v. Nordic Village, Inc.*, —— U.S. ——, —— – ——, 112 S.Ct. 1011, 1014–15, 117 L.Ed.2d 181 (1992); *U.S. v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607, 613 (1980); *U.S. v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 1503, 23 L.Ed.2d 52, 56 (1969). Moreover, any waiver of immunity "must be construed strictly in favor of the sovereign, and not enlarged beyond what the language requires." *U.S. v. Nordic Village, Inc.*, —— U.S. at ——, 112 S.Ct. at 1015 (*quoting Ruckelshaus v. Sierra Club*, 463 U.S. 680, 685, 103 S.Ct. 3274, 3278, 77 L.Ed.2d 938 (1983)). Congress provided for a limited waiver of sovereign immunity in section 106 of the Bankruptcy Code, which provides:

(a) A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose.

(b) There shall be offset against an allowed claim or interest of a governmental unit any claim against such governmental unit that is property of the estate.

(c) Except as provided in subsections (a) and (b) of this section and notwithstanding any assertion of sovereign immunity—

(1) a provision of this title that contains "creditor", "entity" or "governmental unit" applies to governmental units; and

(2) a determination by the court of an issue arising under such a provision binds governmental units.

11 U.S.C. § 106.

■ In construing section 106, the Supreme Court has characterized subsections (a) and (b) as unequivocal expressions of very limited exceptions to the doctrine of sovereign immunity:

Subsections (a) and (b) of section 106 meet this "unequivocal expression" requirement with respect to monetary liability ... [T]hey plainly waive sovereign immunity

---

**4.** *See also In re Atlantic Business and Community Corp.*, 901 F.2d 325, 329 (3rd Cir.1990); *In re Bloom*, 875 F.2d 224, 227 (9th Cir.1989); *In re Solis*, 137 B.R. 121, 132 (Bankr.S.D.N.Y.1992); *In re Gault*, 136 B.R. 736, 738 (Bankr.E.D.Tenn. 1991).

**5.** *See e.g.*, 26 C.F.R. § 601.101, at 5; *Castleberry v. Alcohol, Tobacco and Firearms Div.*, 530 F.2d 672, 673 n. 3 (5th Cir.1976); *Deleeuw v. I.R.S.*,

681 F.Supp. 402 (E.D.Mich.1987); *Krouse v. United States*, 380 F.Supp. 219 (C.D.Cal.1974); *In re Perry*, 90 B.R. 565 (Bankr.S.D.Fla.1988).

**6.** *See e.g., Bornholdt v. Brady*, 869 F.2d 57, 69 (2nd Cir.1989); *McDougald v. I.R.S. (Matter of McDougald)*, Adv. No. 90–4177, Ch. 13 Case No. 89–40326, slip op. at 5 (Bankr.S.D.Ga. April 24, 1991) (Davis, B.J.).

with regard to monetary relief in two settings: compulsory counterclaims to governmental claims, 11 U.S.C. § 106(a); permissive counterclaims to governmental claims capped by a setoff limitation, 11 U.S.C. § 106(b).[7]

*U.S. v. Nordic Village, Inc.,* —— U.S. ——, ——, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992). *See also In re Solis,* 137 B.R. 121 (Bankr.S.D.N.Y.1992); *Taborski v. U.S.,* 141 B.R. 959, 964 (N.D.Ill.1992); *Taylor v. United States (In re Taylor),* Ch. 13 Case No. 89–11583, Adv. No. 90–1036, slip op. at 3 (Bankr. S.D.Ga. Sept. 24, 1990) (Dalis, B.J.). Both subsections require that the government have a claim against the estate as a prerequisite to their application, although only subsection (b) expressly requires that the governmental unit have an "allowed claim" in the debtor's case. The key difference between the two provisions, however, is that subsection (a) waives immunity with regard to an affirmative recovery of damages where the debtor's claim and the government's claim arise out of the same transaction, while subsection (b) permits a narrower recovery (limited to the value of any claim the government has against the estate) in a greater number of circumstances because the claims do not have to be transactionally related. *In re Solis,* 137 B.R. 121, 125 (Bankr.S.D.N.Y. 1992); *U.S. v. McPeck,* 910 F.2d 509, 512–13 (8th Cir.1990).

■ Because the Service has two allowed claims in Debtor's case, there is no question that the United States' has waived its immunity with regard to any damages which Debtor might offset against those claims under subsection (b). Debtor, however, is seeking an affirmative recovery of damages from the IRS. As a result, the requirements of section 106(a) must be satisfied before the IRS can be deemed to have waived its sovereign immunity with regard to such a recovery. In applying section 106(a), this court has previously held that sovereign immunity is waived for affirmative recovery against governmental unit only when all of the following conditions are met:

(1) the estate has a claim against the governmental unit and the governmental unit has a claim against the estate;

(2) the claim against the governmental unit is property of the estate; and

(3) the claims of both the estate and the governmental unit must arise out of the same transaction or occurrence.

*See McDougald v. Internal Revenue Service (Matter of McDougald),* Adv. No. 90–4177, slip op. at 12 (Bankr.S.D.Ga. April 24, 1991); *Matter of Cowart,* 128 B.R. 492, 497 (Bankr. S.D.Ga.1990). *See also Taylor v. United States (In re Taylor),* Ch. 13 Case No. 89–11583, Adv. No. 90–1036, 1990 WL 424983, slip op. (Bankr.S.D.Ga. Sept. 21, 1990) (Dalis, B.J.), *aff'd,* CV191–093, 1991 WL 537024 (S.D.Ga. Sept. 5, 1991), *reaff'd,* 148 B.R. 361 (S.D.Ga.1992); *In re Solis,* 137 B.R. 121 (Bankr.S.D.N.Y.1992) (*citing Matter of Cowart,* 128 B.R. at 497).

---

**7.** Subsection (c), on the other hand, has been labeled by the Supreme Court as being susceptible to more than one interpretation. *U.S. v. Nordic Village, Inc.,* —— U.S. at ——, 112 S.Ct. at 1015. For that reason, the Court has held that subsection (c) does not contain the unambiguous and unequivocal language required to waive sovereign immunity with respect to claims for monetary relief against either a state government or the federal government. *Hoffman v. Connecticut Dept. of Income Maintenance,* 492 U.S. 96, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989) (plurality opinion holding that states's immunity not waived with respect to monetary damages under section 106(c) and the 11th Amendment); *U.S. v. Nordic Village, Inc.,* —— U.S. at ——, 112 S.Ct. at 1015 (1992) (majority opinion holding that federal government's immunity not waived with respect to monetary damages under section 106(c)). Subsection (c) is not, however, completely ineffective as a waiver of sovereign immunity. Under the Supreme Court's construction of subsection (c), a state or federal governmental unit "that files no proof of claim would be bound, like other creditors, by discharge of debts in bankruptcy, including unpaid taxes, but would not be subjected to monetary recovery." *Hoffman v. Connecticut Dept. of Income Maintenance,* 492 U.S. at 102, 109 S.Ct. at 2822–23, 106 L.Ed.2d at 84–85. (plurality opinion). Thus, governmental units are still completely subject to the avoiding power of 11 U.S.C. Section 362(a), but are not liable for damages under section 362(h) until and unless the unit has a claim under Section 106(a), or files a proof of claim under Section 106(b). *See In re Pearson,* 917 F.2d 1215, 1215–16 (9th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 1291, 117 L.Ed.2d 514 (1992); *U.S. v. McPeck,* 910 F.2d 509, 511 (8th Cir.1990).

■ The first prong of the test simply requires that the estate have a claim against the governmental unit and that the governmental unit have a claim against the estate. Although there has been some disagreement among the courts as to whether the governmental unit must have filed a proof of claim against the estate, this court has previously concluded that the express language of section 106(a) makes clear that it merely requires that the governmental unit have a claim against the debtor's estate:

> A "claim" means a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured. "The express language of § 106(a) says nothing about the necessity of the government unit filing a proof of claim in order to trigger the waiver of sovereign immunity. *By the clear terms of the statute, the waiver is triggered by the existence of the government's 'claim', not the filing of the proof of claim."*

*McDougald, supra,* at 8–9 (*quoting Taylor, supra,* at 5–6 (emphasis original, citations omitted). *Cf. Matter of Cowart,* 128 B.R. at 497 (no waiver of immunity under section 106(a) because IRS did not have a claim against debtor). *Contra In re Nichols,* 143 B.R. 104 (Bankr.S.D.Ohio 1992) (IRS must file proof of claim before Chapter 7 debtor could have affirmative recovery of damages for IRS' alleged intentional violation of the automatic stay). Under either view, this prong is satisfied in this case because the IRS filed a proof of claim in Debtor's case, and Debtor has a claim against the United States based upon the IRS' willful violation of the stay.

As to the second prong, this court has previously determined that a debtor's claim for damages under section 362(h) is property of the estate under 11 U.S.C. Sections 541(a)(1) and 1306(a)(1). *McDougald, supra,* at 9–10. Most courts are in agreement. *See e.g., United States v. McPeck,* 910 F.2d 509, 512–13 (8th Cir.1990) (where IRS violated

stay by continuing its tax collection efforts after debtor filed a Chapter 13 case, debtor's § 362(h) claim for damages (including attorney's fees) against the IRS belongs to debtor's estate): *In re Solis,* 137 B.R. at 126 ("Debtor's claim [against the IRS under § 362(h) ] is property of the estate by operation of §§ 541 and 1306"). Therefore, any damages that Debtor successfully proves that she suffered as a result of the IRS' willful violation of the stay are property of the estate.

■ As to the third prong of the test, a determination of whether the claims arise out of the same transaction or occurrence requires the court to employ the same analysis that it would use in determining whether a claim is a "compulsory counterclaim" under Rule 13 of the Federal Rules of Civil Procedure. *See McDougald, supra,* at 10; *Taylor, supra,* at 6. Rule 13 defines a compulsory counterclaim as a claim which "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed.R.Civ.P. 13(a). In applying Rule 13, the "logical relationship" test is the appropriate standard within the Eleventh Circuit. *Taylor, supra,* at 7 (*citing U.S. v. Aronson,* 617 F.2d 119, 121 (5th Cir.1980) [8]). In applying the "logical relationship" test to section 106(a) of the Bankruptcy Code, this court has formerly adopted Ninth Circuit Bankruptcy Appellate Panel's analysis of this issue in *In re Bulson,* 117 B.R. 537, 541 (9th Cir. BAP 1990) *aff'd* 974 F.2d 1341 (9th Cir.1992), as follows:

> The basic approach under the ["logical relationship"] test is to analyze whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all issues should be resolved in one lawsuit. A logical relationship exists when the counterclaim arises from the same aggregate set of operative facts as the initial claim, in that the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the

---

8. Decisions of the United States Court of Appeals for the Fifth Circuit, which were decided prior to September 30, 1981, are binding precedent in

the Eleventh Circuit. *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206 (11th Cir.1981).

claim rests activates additional legal rights otherwise dormant in the defendant.

In this case, the IRS's claim against the debtor arises from the debtor's failure to pay taxes owed. The debtor's claim arises pursuant to the attempt by the IRS to collect these taxes owed by the debtor. The basis of both cases revolve around the aggregate core of facts regarding the debtor's unpaid taxes. Therefore, ... under these circumstances the essential facts related to the tax claim itself are logically related to the government's collection activities.

*McDougald, supra,* at 10–12 (*quoting Bulson,* 117 B.R. at 541.).[9]

The instant case presents the identical situation to that which the Court faced in *Bulson.* The IRS' claim against Debtor arises from Debtor's failure to pay certain tax obli-

gations, while the Debtor's claim against the IRS arises out of the IRS' post-petition activity in attempting to collect on those tax obligations. Thus, both claims have their origin in the same aggregate core of facts; Debtor's failure to pay her tax obligation. Therefore, the facts which gave rise to the IRS' claim against Debtor (i.e., Debtor's failure to pay certain tax obligations), are "logically related" to the facts which form the basis of Debtor's claim under section 362(h) (i.e., IRS' post-petition collection activities on these tax obligations).

Accordingly, I find that all three of the necessary conditions for a waiver of sovereign immunity under section 106(a) have been satisfied. The United States is, therefore, deemed to have waived sovereign immunity with respect to the debtors' claim for damages under section 362(h).[10] This conclusion does not, however, completely resolve

---

**9.** *Accord In re Pinkstaff,* 974 F.2d 113 (9th Cir. 1992) (reaffirming the approach taken in *Bulson*); *In re Boldman,* 157 B.R. 412 (C.D.Ill.1993) (concluding that debtor's claim for attorney's fees against the IRS under section 362(h) arose out of same transaction or occurrence from which IRS' claim for pre-petition taxes arose); *In re Solis,* 137 B.R. at 127 (Bankr.S.D.N.Y.1992) ("We are not inclined to disregard the weight of reasoned authority without reason ... and therefore find that both [the IRS claim for past due taxes and debtor's claim for damages under § 362(h)] arose out of same transaction."); *In re Price,* 130 B.R. 259, 270 (N.D.Ill.1991) (IRS' erroneous levy and the resulting claim for attorney's fees by debtor would not have occurred had there not been unpaid taxes which IRS was trying to collect, and, therefore, interpretation which treats the two claims as arising from distinct events turns a blind eye to reality); *Taborski v. U.S.,* 141 B.R. 959 (N.D.Ill.1992) (debtor's claim against IRS and IRS' claim against debtor arose out of same transaction and occurrence, which was IRS' attempt to collect the taxes); *In re Lile,* 103 B.R. 830, 835 (Bankr.S.D.Tex.1989) *aff'd* 161 B.R. 788 (S.D.Tex.1993) (IRS claim for unpaid taxes and debtor's claim for damages for post-petition levy arose out of same transaction or occurrence). *Contra In re Rebel Coal Co., Inc.,* 944 F.2d 320 (6th Cir.1991) (concluding that claim for attorneys' fees did not arise out of same transactions as a tax collection claim); *In re Academy Answering Service, Inc.,* 100 B.R. 327, 330 (N.D.Ohio 1989) (holding that IRS claim for taxes and claim of debtor against IRS for violation of automatic stay did not arise out of the same transaction or occurrence).

**10.** *Accord In re Boldman,* 157 B.R. 412 (C.D.Ill. 1993) (concluding that IRS waived its sovereign immunity under § 106(a) with respect to attor-

ney's fees sought by debtor under § 362(h) for IRS' issuance of a Notice of Intent to Levy in violation of the automatic stay); *In re Solis,* 137 B.R. 121 (Bankr.S.D.N.Y.1992) (section 106(a) waives sovereign immunity and opens the door to an award of damages against the IRS for willful violations of the automatic stay where IRS levied on debtor's bank account post-petition for tax liabilities arising pre-petition); *In re Price,* 130 B.R. 259, 270 (N.D.Ill.1991) (IRS, by filing proof of claim in Chapter 13 proceeding, was deemed to have waived its sovereign immunity under section 106(a) with respect to that claim and thus could be held liable for willful violation of stay arising out of its post-petition collection attempt, even though debtors' claim for damages arose after confirmation of their Chapter 13 plan); *Taborski v. U.S.,* 141 B.R. 959 (N.D.Ill. 1992) (IRS waived sovereign immunity under section 106(a) with respect to Chapter 13 debtor's claim for costs and attorney fees that was proximately linked to actions which IRS took to recover back taxes, where IRS had filed proof of claim in the case); *In re Bulson,* 117 B.R. 537 (9th Cir. BAP 1990) *aff'd* 974 F.2d 1341 (9th Cir.1992) (IRS' sovereign immunity from damages for willful violation of automatic stay in Chapter 13 case was waived under section 106(a) where essential facts relating to tax claim for pre-petition liability were logically related to IRS' post-petition collection activities); *In re Lile,* 103 B.R. 830, 835 (Bankr.S.D.Tex.1989) *aff'd* 161 B.R. 788 (S.D.Tex.1993) (IRS can be held liable for punitive damages under section 106(a) where same operative facts serve as the basis for IRS' claim for pre-petition taxes as well as debtor's claim for violation of the automatic stay).

this issue because the United States raises sovereign immunity as a separate and distinct defense to Debtor's claim for punitive damages. The United States, relying upon a line of cases originating with the Supreme Court's decision in *Missouri Pacific R. Co. v. Ault,* 256 U.S. 554, 41 S.Ct. 593, 65 L.Ed. 1087 (1921), asserts that any waiver of immunity under sections 106(a) or 106(b) of the Code does not encompass a waiver of immunity with regard to an award of punitive damages. Thus, an examination of *Ault* and its progeny is in order.

In *Ault,* the President of the United States had taken possession and control of the Missouri Pacific Railroad during World War I pursuant to the Federal Control Act of 1918. The railroad was operated through the Director General of Railroads under the Act. Ault was a discharged employee who brought an action against the railroad for failing to remit his final wages within the time limits imposed by an Arkansas statute. The statute imposed a penalty for failure to comply with the time limits set therein. Judgment was awarded jointly against the Director General and the railroad company in the amount of $50.00 in actual wages and $390.00 as a penalty. The award was affirmed by the Supreme Court of Arkansas, and the Director General appealed to the United States Supreme Court.

Section 10 of the Federal Control Act provided that carriers operated by the Director General "shall be subject to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law," while Section 15 of the Act provided in part that the "lawful police regulations of the several states shall continue unimpaired." *Ault,* 256 U.S. at 563, 41 S.Ct. at 597. Based upon these provisions of the Act, the Director General argued on appeal to the Supreme Court that his office enjoyed immunity as to the penalty imposed under the Arkansas statute. The Court agreed with the Director General, concluding that Congress did not, in enacting Section 10 and 15 of the Federal Control Act, intend to waive the United States' sovereign immunity with respect to penalties:

By these provisions the United States submitted itself to the various laws, state and federal, which prescribed how the duty of a common carrier by railroad should be performed and what should be the remedy for failure to perform ... But there is nothing either in the purpose or the letter of these clauses to indicate that Congress intended to authorize suit against the government for a penalty, if it should fail to perform the legal obligations imposed. The government undertook as carrier to observe all existing laws; it undertook to compensate any person injured through a departure by its agents or servants from their duty under such law; but it did not undertake to punish itself for any departure by the imposition upon itself of fines and penalties or to permit any other sovereignty to punish it.

*Id.* 256 U.S. at 563, 41 S.Ct. at 597. In reaching this conclusion, however, the Court was simply enforcing the limitations expressly reserved by the General Orders which had been issued under the Act, one of which expressly excluded "fines, penalties, or forfeitures" from the list of actions which could be brought directly against the Director General. *Id.* 256 U.S. at 564–65, 41 S.Ct. at 597, n. 5.

Courts have since applied *Ault* expansively in construing the waiver of immunity effected under a "sue and be sued" clause of a federal agency or instrumentality. *See e.g., Smith v. Russellville Production Credit Ass'n,* 777 F.2d 1544, 1549 (11th Cir.1985) (finding the "established rule" to be that "punitive damages cannot be recovered from the United States or its agencies."); *Painter v. Tennessee Valley Authority,* 476 F.2d 943, 944 (5th Cir.1973) (Congress, in enacting provision allowing TVA to sue and be sued in tort or contract, did not waive sovereign immunity with respect to punitive damages); *Commerce Federal Sav. Bank v. Federal Deposit Ins. Co.,* 872 F.2d 1240, 1246 (6th Cir.1989) (absent express waiver of immunity to such damages, F.D.I.C. is immune from the imposition of punitive damages against it); *Matter of Sparkman,* 703 F.2d 1097 (9th Cir.1983) (Production Credit Association, a federally chartered but privately owned corporation, cannot, under its "sue and be sued" clause,

be held liable for punitive damages); *In re Three Mile Island Litigation*, 605 F.Supp. 778, 784 (M.D.Penn.1985) ("[T]he United States, its agencies and instrumentalities may not be held liable for punitive damages without the express consent of Congress.").

Two related principles emerge from *Ault* and its progeny. The first is that "the United States, its agencies, and instrumentalities cannot be held liable for punitive damages unless there is express statutory authority for such damages." [11] The second principle is that the typical "sue and be sued" clause within a federal agency's enabling legislation is not express enough to waive an agency's immunity to punitive damages. The waiver of immunity in this case, however, is found in the Bankruptcy Code rather than any sort of generic "sue and be sued" provision, and the former Fifth Circuit clearly recognized that Congress could otherwise waive a federal agency's immunity from punitive damage awards. *Painter v. Tennessee Valley Authority*, 476 F.2d at 945, n. 5. The question in this case, then, is whether sections 106(a) and 106(b) provide the court with the "express statutory authority" to award punitive damages against the United States.

Two basic canons of statutory construction must guide the inquiry into whether sections 106(a) and 106(b) waive sovereign immunity with respect to punitive damages. The first is that, in construing any statute, it is the duty of the court "to give effect to the intent of Congress, and in doing so [the court's] first reference is ... to the literal meaning of words employed." *Flora v. U.S.*, 357 U.S. 63, 65, 78 S.Ct. 1079, 1081, 2 L.Ed.2d 1165 (1958).[12] The second principle, as previously set forth, is that any waiver of sovereign immunity "must be construed strictly in favor of the sovereign, and not enlarged beyond what the language requires." *U.S. v.*

*Nordic Village, Inc.*, —— U.S. at ——, 112 S.Ct. at 1015 (*quoting Ruckelshaus v. Sierra Club*, 463 U.S. 680, 685, 103 S.Ct. 3274, 3278, 77 L.Ed.2d 938 (1983)).

As previously noted, sections 106(a) and 106(b) unequivocally waive sovereign immunity with respect to an award of monetary damages in two very limited situations: (1) When a debtor has a compulsory counterclaim to a governmental unit's claim; and (2) When a debtor has a permissive counterclaim against a governmental unit, with recovery being limited to the amount of the governmental unit's allowed claim against the estate. *See Nordic Village*, —— U.S. at ——, 112 S.Ct. at 1015. Once the conditions of sections 106(a) or 106(b) are satisfied, however, the language of both provisions is expansive in specifying the kinds of monetary damages for which immunity is waived. Section 106(a) provides that sovereign immunity is deemed waived "with respect to *any claim*"[13] that satisfies the three conditions set out above,[14] while section 106(b) provides for the "offset against an allowed claim or interest of a governmental unit *any claim* ... that is property of the estate."[15] Although the term "any" is not defined in the Bankruptcy Code, Black's Law Dictionary defines it, in part, as:

> Some; one out of many; an indefinite number. One indiscriminately of whatever kind or quantity ... It is often synonymous with "either", "every", or "all".

Black's Law Dictionary 86 (5th ed. 1979). Thus, even when strictly construed in favor of the United States, use of the word "any" as the sole modifier of or limitation upon the term "claim" evinces an intent on the part of Congress to extend the waiver of immunity in sections 106(a) and 106(b) to all monetary claims, including those based upon punitive damages under section 362(h).

---

11. *Matter of Sparkman*, 703 F.2d at 1097 (*citing Missouri Pacific R., Co. v. Ault*, 256 U.S. 554, 41 S.Ct. 593, 65 L.Ed. 1087 (1921)).

12. *See also Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 557, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990) ("Our construction ... is guided by the fundamental canon that statutory interpretation begins with the language of the statute itself."); *U.S. v. Ron Pair Enter., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030,

103 L.Ed.2d 290 (1989) ("The sole function of the court is to enforce [a statute] according to its terms.").

13. 11 U.S.C. §§ 106(a) (emphasis added).

14. *See* Section I, *supra* p. 20.

15. 11 U.S.C. § 106(b) (emphasis added).

Although there is very little case law on this precise issue, what little there is supports this conclusion. The Court of Appeals for the Fourth Circuit has made the following observations about the waiver effected by section 106 of the Code:

> We see nothing inconsistent in concluding that, by the assertion of its claim against the [bankruptcy] estate, the FDIC waived the protections it otherwise enjoys, both under the doctrine of sovereign immunity and under the Tort Claims Act.... "[T]he Bankruptcy Code's explicit waivers of sovereign immunity are entirely distinct, separate and independent from and in addition to those found in the FTCA."

*Anderson v. Federal Deposit Ins. Corp.,* 918 F.2d 1139, 1144 (4th Cir.1990) (*quoting in part In re Inslaw, Inc.,* 76 B.R. 224, 234 (Bankr.D.D.C.1987)). Another court has described the waiver of immunity under section 106(a) as being "complete", so that "the entire bankruptcy code applies including those provisions such as § 362(h) which provide for monetary damages." *U.S. v. INSLAW, Inc.,* 113 B.R. 802, 813 (D.D.C.1989), *rev'd on other grounds,* 932 F.2d 1467 (D.C.Cir.1991). Only one court has expressly considered the issue of whether section 106 is effective in waiving the United States' immunity with regard to punitive damages, and it reached the following conclusion:

> [T]he plain language of sections 106(a), (b), and (c) indicates that FmHA has waived sovereign immunity. Accordingly, an award of punitive damages would be awardable if there existed "appropriate circumstances."

*U.S. By and Through Farmers Home Admin. v. Ketelsen,* 104 B.R. 242, 253 (D.S.D. 1988), *aff'd In re Ketelsen,* 880 F.2d 990 (8th Cir.1989). Finally, a number of courts, based upon a waiver of immunity under sections 106(a) and 106(b), have awarded punitive damages against the IRS under section 362(h). *See In re Lile,* 161 B.R. 788, 792 (S.D.Tex.1993) (affirming award of punitive damages against IRS); *In re Gault,* 136 B.R. 736, 739 (Bankr.E.D.Tenn.1991) (awarding punitive damages against IRS); *In re Nichols,* 1991 WL 539972, slip op. at 3 (Bankr.

E.D.Mo. Feb. 22, 1991) (awarding punitive damages against IRS); *In re Davis,* 131 B.R. 50 (Bankr.E.D.Va.1991) (awarding punitive damages against IRS), *rev'd on other grounds, Davis v. IRS,* 136 B.R. 414 (E.D.Va. 1992) (concluding circumstances surrounding IRS' violation of stay did not warrant punitive damages).

In *Lile,* the district court for the Southern District of Texas affirmed the bankruptcy court's [16] award of $100,000.00 in punitive damages against the IRS under section 362(h) for its willful violation of the stay in attempting to seize a Chapter 11 debtor's leasehold premises and other personal property. *In re Lile,* 161 B.R. at 792. In affirming the decision, the District Court concluded that punitive damages were appropriately awarded against the United States, reasoning as follows:

> The court has concluded that 11 U.S.C. § 106(a) waives the government's sovereign immunity. 11 U.S.C. § 362(h) states that punitive damages may be recovered in appropriate circumstances. The IRS cites no case specifically holding that punitive damages cannot be recovered for a § 362(h) violation. A number of courts have held that punitive damages may be recovered against the IRS.

*Id.* (citations omitted).

■ Similarly, the IRS has not cited, and this court has not located, a single decision in which a court, after finding a waiver of immunity under sections 106(a) or 106(b), refuses to award punitive damages against the United States based upon sovereign immunity. Thus, in view of the broad language employed by Congress in defining the kinds of claims to which sovereign immunity is waived, as well as the relevant case law construing these provisions, I conclude that sections 106(a) and 106(b) of the Bankruptcy Code are effective in waiving the IRS' sovereign immunity with respect to punitive damages awarded pursuant to section 362(h) of the Code. Having already determined that the requirements of section 106(a) have been satisfied in this case, the IRS is deemed to

---

16. *See In re Lile,* 103 B.R. 830 (Bankr.S.D.Tex. 1989).

have waived its immunity with respect to any damages which Debtor satisfactorily proves.

## 3. Damages

As previously set forth, section 362(h) of the Bankruptcy Code provides that an individual debtor injured by a willful violation of the stay "*shall recover* actual damages, including costs and attorney's fees, and in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(h) (emphasis added). Thus, the language of section 362(h) suggests that "an award of actual damages is mandatory upon a finding of a willful violation, but an award of punitive damages is discretionary and proper only in appropriate circumstances." *Davis v. IRS*, 136 B.R. 414, 423 n. 20 (E.D.Va.1992).[17] The mandatory tone of section 362(h) does not, however, diminish a debtor's obligation to sufficiently prove his or her actual damages. "A damage award [under 362(h) ] must not be based on 'mere speculation, guess, or conjecture.' " *In re Gault*, 136 B.R. 736, 739 (Bankr.E.D.Tenn. 1991) (*quoting John E. Green Plumbing & Heating Co. v. Turner Const. Co.*, 742 F.2d 965, 968 (6th Cir.1984), *cert. denied*, 471 U.S. 1102, 105 S.Ct. 2328, 85 L.Ed.2d 845 (1985)).[18]

Debtor claims to have suffered, as a direct result of the Service's post-petition levy, actual damages in the form of costs, mental anguish, and attorney's fees. Debtor also seeks an award of punitive damages.

Debtor's proof as to the actual costs which she incurred as a result of the levy was essentially uncontradicted by the Service. Accordingly, I find that Debtor has adequately proven that she is entitled to compensation for the following costs:

1) Returned check charges in the total amount of $120.00;

2) Lost wages in the total amount of $360.00; and

3) Travel expenses in the total amount of $108.55.

Debtor's entitlement to damages stemming from her mental anguish, on the other hand, is a more difficult question. There is little doubt that Debtor was placed in a number of traumatic situations as a direct result of the IRS' wrongful levy upon her account. First, I note that the levy denied Debtor access to any funds within her account for approximately seven days. A checking account may be the primary or even exclusive means that an individual has to purchase the essentials items needed for day to day existence. Certainly it is not bold to suggest that an individual who is in the midst of a Chapter 13 case does not have an abundance of resources to fall back upon in the event that access to her checking account is blocked.[19] Debtor's inability to hold a birthday party for her eleven-year-old child or to negotiate, even after the levy was removed, a check for groceries at the Kroger supermarket points up the difficulties that the levy imposed upon Debtor's life. Moreover, Debtor was forced to contend with the possibility that any number of checks, written before the levy was imposed, could likely be dishonored as they were presented for payment after the account had been frozen. In fact, a number of Debtor's checks were dishonored as a direct result of the levy.

There is, nevertheless, a question of whether Debtor has sufficiently proven that she has suffered any emotional damages as a result of these admittedly intrusive and traumatic events. The IRS contends that Debtor has not met her burden of proof with respect to these damages because no competent medical expert testimony was presented to corroborate her claim. There are a number of reported decisions in which the courts have

---

**17.** *See also Matter of Mullarkey*, 81 B.R. 280, 284 (Bankr.D.N.J.1987).

**18.** *See also Archer v. Macomb County Bank*, 853 F.2d 497, 500 (6th Cir.1988) (reversing bankruptcy court because evidence of lost contracts due to violation of stay was too speculative); *Lovett v. Honeywell, Inc.*, 930 F.2d 625, 629 (8th Cir.1991) ("We are ... satisfied that there is insufficient evidence in the record to support an award of

actual damages ..."); *In re Alberto*, 119 B.R. 985, 995 (Bankr.N.D.Ill.1990) ("Once a party has proven that he has been damaged, he needs to show the amount of damages with reasonable certainty.").

**19.** The Confirmation Order entered in this case expressly provides that "Debtor shall not incur any indebtedness without the approval of the Court or the Trustee."

refused to award damages under section 362(h) because the debtor failed to introduce any medical evidence to support such a claim.[20] Other courts, however, have imposed a less stringent burden upon the Debtor when it was otherwise clear that the debtor suffered some appreciable emotional harm as a result of a creditor's violation of the stay.[21]

 The Service also contends that, under Georgia law, Debtor would be barred from recovering such damages because the IRS' actions were not malicious and did not result in actual physical bodily contact. This contention is based upon the "impact rule", which is followed by courts in the State of Georgia when a plaintiff seeks recovery for fright, shock or mental suffering.[22] The "impact rule" effectively eliminates the tort of *negligent* infliction of emotional distress in the State of Georgia, but it does not eliminate the tort of *intentional* infliction of emotional harm.[23]

 A willful violation of the automatic stay is not, however, a tort under the law of Georgia. Rather, the automatic stay is imposed exclusively as a matter of federal bankruptcy law, and section 362(h) is a remedial provision within the federal Bankruptcy Code by which a debtor's rights under the stay are vindicated. Thus, section 362(h) creates an independent federal bankruptcy cause of action which is based exclusively upon a violation of the automatic stay rather than any duty created under state law.[24]

---

**20.** *See e.g., In re Colon,* 102 B.R. 421, 429, n. 14 (Bankr.E.D.Pa.1989) ("[A]ny claim for damages due to [debtor's] fear or anxiety that an arrest warrant for her would be issued must be affected by the absence of corroborative medical evidence."); *In re Crispell,* 73 B.R. 375, 380 (Bankr.E.D.Mo.1987) ("Debtors did suffer some embarrassment as a result of checks which were returned unpaid during the freeze period, but they did not require medical treatment for their distress. Because the emotional distress suffered by Debtors was fleeting, inconsequential and medically insignificant, the Court concludes that it is not compensable.") (*citing Bass v. Nooney Co.,* 646 S.W.2d 765, 768–773 (Mo.1983)); *In re Demp,* 23 B.R. 239, 240 (Bankr.E.D.Pa.1982) ("The shock of seeing her property posted for Sheriff's sale allegedly caused [the debtor] severe distress, so severe that it was necessary to visit her physician. No evidence of this visit was produced ... and no other credible evidence of damages was submitted ... The Court, therefore, does not find itself in a position to award damages to the debtor."); *In re McPeck,* 1991 WL 8405 (Bankr.D.Minn.1991) ("Debtor ... has failed to show any actual damages except attorney's fees. I cannot put a price on any distress the telephone calls may have caused her.").

**21.** *See e.g., In re Wagner,* 74 B.R. 898, 905 (Bankr.E.D.Pa.1987) (noting that debtor produced very little evidence that he suffered any long-term physical or emotional harm as a result of creditor's stay violation but awarding him $100.00 in actual damages because it was clear from debtor's testimony that he experienced some shock, alarm and fear as a result of the stay violation); *In re Fisher,* 144 B.R. 237 (Bankr.D.R.I.1992) (awarding debtor $1000.00 in actual damages under section 362(h) for the embarrassment and emotional distress intentionally inflicted upon her by creditor's harassment and threats and forceful repossession of debtor's vehicle in contravention of the stay without requiring corroborating medical evidence); *In re Carrigan,* 109 B.R. 167, 171 (Bankr.W.D.N.C.1989) (noting that debtor's emotional injury was "somewhat imprecise", but nevertheless real, and clearly the result of the creditor's outrageous actions; meriting an award of $1000.00 for actual damages).

**22.** *See e.g., OB–GYN Assoc. of Albany v. Littleton,* 259 Ga. 663, 666, 386 S.E.2d 146 (1989) (*overruling Christy Bros. Circus v. Turnage,* 38 Ga.App. 581, 144 S.E. 680 (1928)); *Howard v. Bloodworth,* 137 Ga.App. 478, 479, 224 S.E.2d 122 (1976).

**23.** *See e.g., Hahn v. Sterling Drug, Inc.,* 805 F.2d 1480 (11th Cir.1986) (*quoting Howard v. Bloodworth,* 137 Ga.App. 478, 479, 224 S.E.2d 122 (1976)); *Arrowsmith v. Williams,* 174 Ga.App. 690, 692, 331 S.E.2d 30 (1985) (*quoting Ga. Power Co. v. Johnson,* 155 Ga.App. 862(2), 274 S.E.2d 17 (1980)) ("The tort of intentional infliction of emotional distress is recognized in this state, where the defendant's actions were so terrifying or insulting as naturally to humiliate, embarrass, or frighten the plaintiff."); *Arrowsmith v. Williams,* 174 Ga.App. 690, 692, 331 S.E.2d 30 (*quoting Sossenko v. Michelin Tire Corp.,* 172 Ga.App. 771, 324 S.E.2d 593 (1984)) ("Claims for intentional infliction of emotional distress have been upheld by the [Georgia Court of Appeals] when the threats on which those claims were based were outrageous and egregious.").

**24.** *See Vahlsing v. Commercial Union Ins. Co., Inc.,* 928 F.2d 486, 489 (1st Cir.1991) ("The actions [in violation of the stay] may be void ab initio, ... but the actor's culpability is a question to be settled by reference to some extrinsic legal standard, whether it is the 'willfulness' requirement of ... § 362(h), or the various common-

The Supreme Court has made clear that "state law does not operate of its own force" when dealing with a federal cause of action:

> [W]hen a federal statute condemns an act as unlawful the extent and nature of the legal consequences of the condemnation, though left by the statute to judicial determination, are nevertheless federal questions, the answers to which are to be derived from the statute and the federal policy which it has adopted.

*Burks v. Lasker,* 441 U.S. 471, 477, 99 S.Ct. 1831, 1836–37, 60 L.Ed.2d 404 (1979) (*quoting Sola Electric Co. v. Jefferson Co.,* 317 U.S. 173, 176, 63 S.Ct. 172, 174, 87 L.Ed. 165 (1942)). I therefore conclude that I am not limited by the "impact rule" in formulating an award for Debtor's emotional damages.

■ Although Debtor apparently did not suffer any out-of-pocket medical expenses or long-term physical or emotional harm as a result of the IRS' wrongful levy, the evidence was uncontradicted that she was forced to endure the stress of knowing that a number of her checks would bounce and dealing with those payees, the emotional trauma of having to cancel a planned birthday party for her child, and the humiliation of being unable, without considerable difficulty and commotion, to negotiate a check for groceries at her neighborhood supermarket. These natural and powerful emotional reactions cannot be dismissed as "fleeting" or "inconsequential." The overpowering sense of humiliation, embarrassment and shame occasioned by the levy and its consequences was only exacerbated by the Debtor's knowledge that she should have been spared these indignities because of the dictates of federal law which her attorney had guaranteed would protect her during her Chapter 13 case. Accordingly, I find it appropriate to award Debtor $5,000.00 in actual, compensatory damages due to her emotional distress. *See In re Wagner,* 74 B.R. 898, 905 (Bankr.E.D.Pa. 1987); *Mercer v. D.E.F., Inc.,* 48 B.R. 562, 565 (Bankr.D.Minn.1985).

■ As to Debtor's claim for attorney's fees, Debtor's counsel submitted a detailed fee application indicating that he had spent a total of 27.09 hours on this matter at the professional rate of $100.00 per hour, thus yielding a total fee of $2,709.00. The IRS asserts that Debtor is not entitled to attorney's fees because she and her attorney did not seek to resolve the dispute in a non-litigious manner. I disagree. Although a number of courts have determined that an award of attorney's fees is not warranted where a debtor and his or her counsel have not attempted to resolve a stay violation before initiating litigation,[25] Debtor and her counsel were well within their rights in bringing the instant action against the Service. Debtor and her attorney believed that she was entitled to significant compensatory damages, particularly for Debtor's mental anguish, as well as punitive damages. The Service has not put before this court any evidence that it was willing to compensate Debtor for any of these injuries. Thus, the amount of the fee, $2,709.00, appearing in all respects to be reasonable, is appropriately awarded to Debtor in compensation for her attorney's fees.[26]

law and statutory theories under which [appellant] chose to bring suit."); *In re Fisher,* 144 B.R. 237, 239 (Bankr.D.R.I.1992) (awarding debtor $1,000.00 in actual damages for embarrassment and intentional infliction of emotional distress without making a finding that the creditor's actions in violating the stay met any standard of outrageousness or egregiousness under state law); *Crossley v. Lieberman,* 90 B.R. 682, 693 (E.D.Pa.1988) *aff'd* 868 F.2d 566 (3rd Cir.1989) (noting that emotional distress as a component of damages under the Fair Debt Collection Practices Act is analogous to emotional distress as a component of damages under 11 U.S.C. § 362(h) and concluding that proof of damages for emotional distress need not rise to the level required to prove tortious intentional infliction of emotional distress); *Smith v. Keycorp. Mortg., Inc.,*

151 B.R. 870, 875 (N.D.Ill.1993) (concluding that 11 U.S.C. § 1322 does not create a private right of action and citing § 362(h) as an example of a Bankruptcy Code provision which does expressly create a private right of action for willful violation of the automatic stay).

**25.** *See In re Houchens,* 85 B.R. 152, 155 (Bankr. N.D.Fla.1988); *In re McLaughlin,* 96 B.R. 554, 560–61 (Bankr.E.D.Pa.1989); *In re Still,* 117 B.R. 251, 254 (Bankr.E.D.Tex.1990).

**26.** *See e.g., In re Lile,* 161 B.R. 788, 794 (S.D.Tex. 1993); *In re Price,* 143 B.R. 190, 193 (Bankr. N.D.Ill.1992); *Taborski v. United States,* 141 B.R. 959, 967 (N.D.Ill.1992); *In re Joslyn,* 75 B.R. 590, 593 (Bankr.D.N.H.1987).

Finally, as to punitive damages, a number of courts have adopted the standard set forth by the court in *In re Wagner*, 74 B.R. 898 (Bankr.E.D.Pa.1987), for determining when "appropriate circumstances" exist for an award of such damages under section 362(h):

> Punitive damages are awarded in response to particularly egregious conduct for both punitive and deterrent purposes. Such awards are reserved for cases in which the defendant's conduct amounts to something more than a bare violation justifying compensatory damages or injunctive relief. To recover punitive damages, the defendant must have acted with actual knowledge that he was violating the federally protected right or with reckless disregard of whether he was doing so.

*Id.* at 903 (*quoting in part Cochetti v. Desmond*, 572 F.2d 102, 106 (3rd Cir.1978) (a cases decided under 42 U.S.C. § 1983)).[27] The Second Circuit Court of Appeals noted that an award of punitive damages under section 362(h) requires "[a]n additional finding of maliciousness or bad faith on the part of the offending creditor . . .",[28] while another line of cases has concluded that punitive damages are appropriate "where an arrogant defiance of the federal law is demonstrated." [29]

■ Under any of these standards, the circumstances of this case warrant the imposition of punitive damages against the IRS. As noted elsewhere in this order, the IRS maintains that it is incapable or unwilling to develop a system of cross-referencing its files to prevent actions such as the ones in this case from occurring. It offers no hope that any system is contemplated or will be instituted in the future. It has been sued on numerous occasions in this District for actions essentially identical to those committed in this case. Doubtless, this is not the only judicial district in which it has so acted. It comes before the Court showing no remorse, apparently believing that it is not subject to the same requirements that other creditors in a bankruptcy proceeding are subject to. The IRS is a federal agency charged with the responsibility of enforcing the federal tax code, and it, of all the litigants in bankruptcy, should be the most attuned to its responsibilities to debtors who have sought the protective shield of 11 U.S.C. Section 362. Its failure to correct known, glaring weaknesses in its internal controls which cause it to repeatedly violate the automatic stay constitutes bad faith, and an arrogant defiance of the majesty of Federal Law which has embodied 11 U.S.C. Section 362 as its "fundamental protection" to debtors in bankruptcy.

As to the appropriate amount, "[a]n award of punitive damages should be gauged by the gravity of the offense and set at a level sufficient to insure that it will punish and deter." *In re Aponte*, 82 B.R. 738 (Bankr. E.D.Pa.1988) (*quoting in part Mercer v. DEF, Inc.*, 48 B.R. 562, 565 (Bankr.D.Minn. 1985)). The IRS' recalcitrance and indifference to the fact that its current system guarantees that it will repeatedly violate the automatic stay, persuade me that an award of $10,000.00 in punitive damages is appropriate in this case.

In sum, I conclude that Debtor is entitled to $588.55 in out-of-pocket costs, $5000.00 in damages for her emotional distress, $2,709.00 in attorney's fees, and $10,000.00 in punitive damages. However, because the IRS has two allowed claims in Debtor's Chapter 13 case, Debtor's recovery must, under the mandatory language of section 106(b) of the Code, be offset against the IRS' remaining allowed claims against the Debtor, with the remaining sums being paid directly to the

---

27. The following courts have adopted the *Wagner* standard in assessing the propriety of an award of punitive damages against a creditor under section 362(h). *In re Gault,* 136 B.R. at 739; *In re Solis,* 137 B.R. 121, 133 (Bankr.S.D.N.Y. 1992); *In re Lile,* 103 B.R. 830, 841 (Bankr. S.D.Tex.1989), *aff'd* 161 B.R. 788 (S.D.Tex. 1993); *In re Falls Building, Ltd.,* 94 B.R. 471, 482 (Bankr.E.D.Tenn.1988).

28. *In re Chateaugay Corp.,* 920 F.2d 183, 186 n. 1 (2nd Cir.1990) (*quoting In re Crysen/Montenay Energy Co.,* 902 F.2d 1098, 1105 (2nd Cir.1990)).

29. *Matter of Mullarkey,* 81 B.R. 280, 284 (Bankr. D.N.J.1987) (*quoting In re Tel-A-Communications Consultants, Inc.,* 50 B.R. 250, 255 (Bankr. D.Conn.1985)).

Chapter 13 trustee and held for disposition upon motion of any party in interest.[30]

### ORDER

Pursuant to the foregoing Findings of Fact and Conclusions of Law IT IS THE ORDER OF THIS COURT that Plaintiff, Penny H. Flynn, shall have judgment entered in her favor and against Defendant, United States of America, in the amount of $18,297.55.

IT IS THE FURTHER ORDER OF THIS COURT that Plaintiff's judgment against the United States of America be set off against any remaining allowed claims which the Internal Revenue Service has in Plaintiff's Chapter 13 case. The remaining balance is property of the bankruptcy estate and shall be paid to the Chapter 13 Trustee and held for disposition upon motion of any party in interest.

30. *See e.g., U.S. v. McPeck,* 910 F.2d 509, 512–13 (8th Cir.1990).